UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PETER ROSE,<br><br>                    Plaintiff,<br><br>        v.<br><br>JOHN DOWD,<br><br>                    Defendant. | DEMAND FOR JURY TRIAL<br><br>   Case No.<br><br>**COMPLAINT** |

Plaintiff Peter Rose ("Rose"), by his attorneys, Martin Garbus (*pro hac vice* pending), counsel to Eaton & Van Winkle LLP, and August J. Ober, IV of the Law Offices of August J. Ober, IV and Associates, LLC, as and for his complaint in the above-entitled action, hereby alleges as follows:

## PARTIES

1.      Rose is a natural person who is a citizen of the State of Nevada, residing in Las Vegas, Nevada.

2.      Defendant John Dowd ("Dowd") is a natural person who, upon information and belief, is a citizen of the States of Massachusetts and/or Virginia, residing in Chatham, Massachusetts and/or Vienna, Virginia.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over the state law claims asserted in this action based on diversity of citizenship pursuant to 28 U.S.C. §1332(a) because the matter in controversy (a) exceeds the sum or value of $75,000, exclusive of interest and costs, and (b) is between citizens of different States.

4.      This District is a proper venue for this action pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## **FACTS COMMON TO ALL CLAIMS**

I.   *Rose's Major League Baseball Career*

5.   Rose is a former professional Major League Baseball ("MLB") player and manager. Rose played in MLB from 1963 to 1986.

6.   Rose played for the Cincinnati Reds (the "Reds") from 1963 to 1978. During that time he was known as the heart and soul of one of MLB's greatest all time teams, the Big Red Machine. During the 1970s, Rose and the Reds won six National League ("NL") West Division titles, four NL pennants, and two World Series titles.

7.   Rose played for the Philadelphia Phillies (the "Phillies") from 1979-1983, during which they won three NL East Division titles and a World Series title.

8.   At the time the Phillies signed Rose, he had more lucrative offers from other teams. When asked why he accepted the Phillies' offer, Rose explained that the Phillies were his first choice.

9.   Rose helped deliver the Phillies their first ever World Series title in 1980, his second season as a Phillie.

10.  Rose resumed his career with the Reds in 1984 and immediately became their player-manager. On September 11, 1985, Rose broke Ty Cobb's all-time hits record.

11.  After retiring as a player in 1986, Rose continued to manage the Reds until on or about August 24, 1989.

12.  Rose's playing honors include the NL Rookie of the Year, three NL batting titles, two gold glove awards, NL MVP, and World Series MVP. Rose was a seventeen-time All-Star and remains MLB's all-time hits record-holder with 4,256 career hits.

### II.     *Rose on MLB's Ineligible List*

13. Because of reports that Rose had bet on baseball, MLB began a confidential investigation concerning whether he engaged in conduct not in the best interests of baseball.

14. Upon information and belief, in 1989, Dowd was a practicing attorney associated with the firm of Akin, Gump, Hauer & Feld LLP ("Akin Gump").

15. On or about February 23, 1989, Dowd, through Akin Gump, was engaged by the Office of the Commissioner of MLB to act as special counsel to confidentially investigate Rose.

16. Upon information and belief, in connection with that confidential investigation, Dowd and two associates and/or detectives interviewed 110 witnesses and compiled thousands of pages of documentation.

17. One of the people interviewed by Dowd was Michael Bertolini, with whom Rose had associated.

18. Dowd issued a confidential written report to the Commissioner, dated May 9, 1989 (the "Dowd Report"). It was two hundred and twenty five pages long, and was a compilation of all the evidence he had garnered against Rose. It included a detailed analysis of the results of his investigation, based on recorded conversations, testimony under oath and documentary evidence compiled and relied upon. In the Dowd Report, Dowd concluded that Rose had bet on the Reds in 1985-87 in violation of Major League Rule 21. A section of the Dowd Report was dedicated to the "Rose-Bertolini Betting".

19. That confidential investigation culminated in a confidential agreement, on or about August 23, 1989, between Rose and the Office of the Commissioner of MLB, who at the time was Commissioner of MLB A. Bartlett Giamatti. The Commissioner did not make any formal findings, but Rose acknowledged that Giamatti had a factual basis to impose a penalty. The

Commissioner imposed and Rose accepted a disciplinary sanction declaring him ineligible in accordance with Major League Rule 21 and placed on the Ineligible List, but reserving his right to apply for reinstatement. Rose was (and has been) effectively banned from working in MLB or participating in MLB events without permission.

20. Being on the Ineligible List also effectively barred Rose from being eligible to be elected to the National Baseball Hall of Fame, pursuant to a rule it adopted in 1991.

### III. Dowd's prior efforts to harm and injure Rose and inconsistencies in regard to his statements made

21. Ever since Dowd investigated Rose in 1989 and Rose was placed on the Ineligible List, Dowd actively sought to prevent Rose from ever being reinstated by MLB or elected to the Hall of Fame, and he ultimately made maliciously false and reckless claims against Rose (as more fully set forth, *infra*).

22. Over the years, Rose has sought reinstatement with MLB. In 1992, Rose first applied for reinstatement. It was the last year of Fay Vincent's tenure as Commissioner. When he was a deputy commissioner for MLB, he had recommended Dowd to be special counsel. As Commissioner, Vincent never acted on Rose's application.

23. In 1998, Rose applied for reinstatement with Vincent's successor, Commissioner Bud Selig. Though it was reported that Selig seriously considered it and met with Rose on November 25, 2002, he never acted on Rose's applications. Nevertheless, as a result, Dowd openly advocated against Rose and his reinstatement, as evidenced by various conflicting statements he made in the press.

24. The Dowd Report expressly states that "[n]o evidence was discovered that Rose bet against the Cincinnati Reds."[1]

---

[1] This is stated at page three, FN 3 of the Dowd Report.

25. But on December 12, 2002, NY Post reporter Joel Sherman reported that "Dowd said he had reliable evidence that Rose indeed bet against his team and was 'close' to being able to officially put it into his report, but was prevented by the need to get the report done quickly." Dowd has never identified this purportedly reliable evidence to which he referred in his interview with Mr. Sherman because he had no such evidence. (A true and correct online copy of Sherman's 12-12-02 article is attached hereto as Exhibit 1.)

26. On the very same day that the NY Post reported that Dowd said he had "reliable evidence" that Rose bet against the Reds, NY's Daily News reported about its interview with Dowd, in which he admitted that he did not find any evidence that Rose bet on the Reds to lose. (A true and correct online copy of O'Keefe's 12-12-02 article is attached hereto as Exhibit 2.)

27. These direct contradictions by Dowd on the very same subject matter are evidence that Dowd would lie when his personal animus toward Rose overcame him. Dowd's statement that he had reliable evidence that Rose bet against the Reds was maliciously false and reckless and intended to harm Rose.

28. On or about May 19, 2003, Dowd was interviewed by Bob Edwards of National Public Radio (along with Cincinnati Reds broadcaster Marty Brennaman). Dowd made clear that he thought Rose should not be reinstated under any circumstance. (A true and correct online copy of NPR's article about its 5-19-03 interview is attached hereto as Exhibit 3.)

29. As reported by the LA Times in a January 6, 2004 article by David Wharton ([published at http://articles.latimes]), Dowd created a website at http://www.thedowdreport.com entitled "DowdReport.com" which states, among other things, "[r]ecently, there has been much renewed interest in the Dowd report and in Pete Rose's lifetime banishment from Baseball." (A true and correct online copy of Wharton's 1-6-04 article is attached hereto as Exhibit 4.)

30. For twelve or more years, Dowd has maintained his website and posted the Dowd Report, where it remains to this day (as of the filing of this complaint). On his website, Dowd never recanted his charge to Mr. Sherman (and others, as identified below) that he had evidence that Rose bet against the Reds.

IV. *Dowd's concerted effort to prevent Rose from being reinstated leading up to the July 14, 2015 All-Star Game in Cincinnati*

31. On or about January 25, 2015, Robert Manfred succeeded Bud Selig as Commissioner of MLB.

32. On or about February 26, 2015, Rose again applied for reinstatement with MLB. That same day, Commissioner Manfred reportedly said (as reported in a February 28, 2015 Newsday article by Steven Marcus [published at http://www.newsday.com]) that Rose "is free to submit a request for reinstatement or reconsideration and I'll deal with it." Mr. Marcus said comments by Manfred "appear[ed] to have rekindled the debate regarding the possible lifting of Pete Rose's lifetime ban…" (A true and correct online copy of Marcus's 2-28-15 article is attached hereto as Exhibit 5.)

33. Dowd again began to openly advocate against Rose and his reinstatement, telling Mr. Marcus that "Manfred should 'remember the historical force of the rule, that no one in the history of baseball who has been declared on the permanently ineligible has ever been readmitted to the game.'" Ex. 5.

34. Because of Rose's ineligibility status, he needed special permission to participate in official MLB events. That includes MLB's annual All-Star game.

35. The 2015 MLB All-Star game was to be held on July 14th, 2015 in the Great American Ballpark in Cincinnati, the home field of the Reds.

6

36. Commissioner Manfred said in March, 2015 that Rose would be granted permission to participate in the All-Star game festivities planned in Cincinnati.

37. As part of the MLB's 2015 All-Star game festivities, MLB created a "Franchise Four" promotion in which MLB fans voted for the 4 players who were the most impactful players who best represented the history of each franchise. MLB planned to honor the home team Reds' fans by presenting their Franchise Four, as part of the pre-game ceremony. It was anticipated that Rose would be voted in, and Commissioner Manfred also allowed his participation in the Franchise Four pre-game celebration.

38. Dowd gave an interview to James Pilcher of the Cincinnati Enquirer, who published an article on March 21, 2015 entitled "Pete Rose's investigator: Never let him back in baseball" (published at http://www.cincinnati.com). In it, Mr. Pilcher reported that Manfred had said he would meet privately with Rose and consider his request for reinstatement. (A true and correct online copy of Pilcher's 3-21-15 article is attached hereto as Exhibit 6.)

39. In Pilcher's article, Dowd again made clear his opposition to Rose ever being reinstated under any circumstance. He also repeated his charge that he had evidence that Rose bet against the Reds, although this time he claimed "that evidence didn't reach the standard to include in our report." Ex. 6, pg. 5 of 13.

40. Upon information and belief, in connection with Rose's 2015 request for reinstatement, Dowd met with MLB executive John McHale Jr. in May or June, 2015 for several hours to discuss Dowd's investigation and the evidence he had compiled.

41. On or about June 23, 2015, Dowd was interviewed by sports radio show host Jim Rome (broadcast by CBS Sports Radio and affiliate radio stations in the U.S.) to talk about newly found documentary evidence recently reported on by ESPN about Rose.

42. During the Rome interview, Dowd repeated his charge that he had evidence that Rose bet against the Reds and said, among other things, "[i]t's just this **terrible arrogance that affects this guy** and his people and you know, shame on him; **he's now been caught bare ass in front of this commissioner, and I love it**. And now, he's standing out there naked."……."**He had Bertolini running young women down in Florida for his satisfaction,** so you know he's just not worthy of consideration or to be a part of the game; this is not who we want in the game of baseball." (A true and correct online copy of Mr. Rome's show's article about his 6-23-15 interview is attached hereto as Exhibit 7.)

43. Dowd's comment to Jim Rome about Bertolini "running young women" for Rose's satisfaction (which was false and malicious and recklessly made) was intended to harm Rose.

*44.* On or about June 25, 2015, Dowd was interviewed by sports radio show host Christopher Russo (broadcast on Sirius Radio) to talk about Rose and about the new ESPN evidence. Before eventually refusing to respond to Russo and hanging up on him, Dowd admitted, when directly challenged by him, that he had no evidence that Rose had bet against the Reds. That contradicted what Dowd had first claimed to Joel Sherman in 2002 (para. 25, *supra*), and then again most recently to both James Pilcher (as reported in his article) (para. 39, *supra*) and to Jim Rome (as stated during his recorded radio interview)(para. 42, *supra*), namely that he had evidence that Rose had bet against the Reds.

V. *Dowd maliciously and recklessly defames Rose during a radio interview the day before the July, 2015 All-Star game*

45. Dowd had previously given approximately six to seven interviews about Rose to long-time television and radio sports broadcaster/producer Bill Werndl over the years. Mr. Werndl's entire sports broadcast career (which began in 1966) was in Philadelphia (except for a 12 year stint in San Diego that ended in 2008).

8

46. In July, 2015, Werndl was with the AM radio station WCHE 1520, situated in West Chester, Pennsylvania, about 25 miles west of Philadelphia. Dowd agreed with Werndl to be interviewed by him about Rose on air.

47. The interview took place on July 13, 2015, telephonically, and was broadcast to WCHE 1520 AM's listening audience in the entire region encompassing the City of Philadelphia.

48. During it, Dowd was asked" "If Pete Rose and you were in a room, and gambling wasn't the topic and this had nothing to do with anything else, do you find Pete a likeable person? Not a likeable person? Do you see the window inside his soul and forget about all this?" Dowd stated :

> No. I've been asked that question -- whether he had any moral bearings at all. And the answer is no. you know, there is a lot of other activity. He constantly violated the concept of laws. **Michael Bertolini, you know, told us that he not only ran bets but he ran young girls for him down at spring training, ages 12 to 14. Isn't that lovely. So that's statutory rape every time you do that**. So, he's not ... he's just not, you know, the kind of person that I find very attractive. He's a street guy.

49. In addition to being broadcast, the interview was also posted on WCHE 1520 AM's website as a podcast, meaning it was readily accessible to anyone online.

50. Dowd's July 13, 2015 statements that Bertolini "ran young girls" for Rose, thereby committing statutory rape, were false and malicious and were designed to injure Rose and did.

9

VI.  *Dowd's defamation of Rose is reported on and pursued;*
     *Dowd refuses to recant, claiming it was "blown out of proportion"*

51.  Dowd's July 13, 2015 false and malicious accusations of statutory rape of young teens by Rose on Philadelphia radio was re-published, and reported on. On August 6, 2015, it was first reported by Randy Miller of NJ Advance Media for NJ.com.[2] (A true and correct online copy of Miller's 8-6-15 article is attached hereto as Exhibit 8.)

52.  Rose first learned of Dowd's false and malicious accusations of statutory rape of young teens from Mr. Miller that same day, and vehemently denied them on the record. Ex. 8

53.  The next day, Rose's representatives Ray Genco and Mark Rosenbaum spoke directly with John McHale Jr. (who had recently met with Dowd) to discuss Dowd's accusations, at which time McHale advised that MLB had no information and nothing in its files to support Dowd's accusation that Bertolini "ran young girls" for Rose or committed statutory rape.

54.  On August 7, 2015, Miller spoke with Dowd about his accusations of statutory rape and Rose's denial. Dowd reportedly told Miller "I have nothing further to say on it"; "I just don't want to discuss it anymore, I think this was blown out of proportion." When Miller reminded him that he was the one to make the accusations (of statutory rape), and that they were serious, he reportedly agreed, stating "They are. You ought to go talk to Michael Bertolini about them. He's the one that made them." (A true and correct online copy of Miller's first of two 8-7-15 articles is attached hereto as Exhibit 9.)

---

[2] NJ Advance Media is, according to its website, a media company that provides content for affiliated newspapers in New Jersey and Pennsylvania, including NJ.com, The Star-Ledger, and The Express-Times of Easton, Pa.

55. As separately reported by Miller later on August 7, 2015, Mr. Bertolini released a public statement through his lawyer Nick De Feis that:

> Mike categorically denies the allegation. He never did any such thing, nor did Pete Rose, nor did Mike say anything to Dowd about the subject. The story is libelous to him and to Rose and should be retracted immediately.

(A true and correct online copy of Miller's second of two 8-7-15 articles is attached hereto as Exhibit 10.)

56. The (Philadelphia) Inquirer Daily News (published online at http://philly.com) ran a story about it on August 6th, with reporter Tommy Rowan quoting Dowd's false and malicious accusations of statutory rape of young teens by Rose and Rose's denial made to Miller (of NJ Advance Media). (A true and correct online copy of Rowan's 8-6-15 article is attached hereto as Exhibit 11.)

57. Rose and his lawyer met with MLB executives on or about September 24, 2015, including Commissioner Manfred and John McHale Jr. to discuss Rose's request for reinstatement. During the meeting, the subject of Dowd's accusation of statutory rape by Rose with young teens was discussed. Rose once again vehemently denied the accusations to Commissioner Manfred and Mr. McHale.

58. In December, 2015, Commissioner Manfred rejected Rose's request for reinstatement.

**FIRST CLAIM FOR RELIEF
AGAINST DOWD
(Defamation *Per Se*)**

59. Rose repeats and realleges each and every allegation contained in paragraphs 1 through 58 hereof as if fully set forth herein.

60. Dowd's on-air statements during WCHE 1520 AM's 7-13-15 broadcast that "Michael Bertolini, you know, told us that he not only ran bets but he ran young girls for him down at

spring training, ages 12 to 14. Isn't that lovely. So that's statutory rape every time you do that" are entirely false in every respect.

61. Rose never did any such thing and until the Dowd accusations, no one had ever claimed he did.

62. What Dowd attributes to Bertolini is false: Bertolini states he never told Dowd any such thing.

63. Dowd's repetition of the statements he attributes to Bertolini and his own statements, *in toto*, are defamatory *per se*, in that they are comprised of false accusations that Rose committed statutory rape.

64. Dowd knowingly made and thereby published his defamatory *per se* statements not only to Bill Werndl and Paul Jolovitz, who were present for the interview (and everyone else in the broadcast booth), but also knowingly made them during an on-air radio broadcast and thereby published them via WCHE 1520 AM to its entire listening audience in the Philadelphia and surrounding broadcast region.

65. Inasmuch as Dowd made his defamatory *per se* statements in direct response to the question "If Pete Rose and you were in a room, and gambling wasn't the topic and this had nothing to do with anything else, do you find Pete a likeable person?", such statements were clearly applicable to Rose.

66. Dowd's statements are comprised of false accusations of statutory rape and the reasonable listener would understand its defamatory meaning.

67. Dowd made his defamatory *per se* statements in response to the question "If Pete Rose and you were in a room, and gambling wasn't the topic and this had nothing to do with anything else, do you find Pete a likeable person? Not a likeable person? Do you see the window inside

his soul and forget about all this?" and the reasonable listener would understand an intent by Dowd that his statements pertained to Rose.

68. Dowd's statements are defamatory *per se* and Rose need not prove monetary harm resulting from their publication as a component of his claim.

69. Nevertheless, Rose has suffered actual compensatory harm to his reputation and standing in the community by reason of Dowd's defamatory *per se* statements, and was initially and has since remained frustrated, distraught, upset, and distressed, resulting in actual compensatory harm in the form of personal humiliation and mental anguish and suffering.

70. Among other things, Dowd's defamatory *per se* statements (both those he attributes to Bertolini and his own statements) were purportedly derived from an investigation that he conducted as special counsel to the Commissioner of MLB about Rose, they materially differed from earlier statements he had made on the same subject matter, and he reiterated his contention that Michael Bertolini made them even after he was made aware that Rose had vehemently denied them.

71. Dowd knew his defamatory *per se* statements to be false when he made them, had a high degree of awareness of their probable falsity, must have entertained serious doubts as to their truth or otherwise had a reckless disregard of whether or not they were false, such that they were made with actual malice.

72. Dowd's defamatory *per se* statements were also made with common law malice, that is, ill will and/or an evil motive.

73. Rose is entitled to recover punitive damages in an amount to be determined at trial.

74. By reason of the foregoing, Rose seeks judgment in an amount to be determined by a jury at trial, but which amount exceeds the jurisdictional minimum of $75,000 exclusive of

interest and costs.

## SECOND CLAIM FOR RELIEF
## AGAINST DOWD
### (Defamation)

75. Rose repeats and realleges each and every allegation contained in paragraphs 1 through 74 hereof as if fully set forth herein.

76. Dowd's on-air statements during WCHE 1520 AM's 7-13-15 broadcast that "Michael Bertolini, you know, told us that he not only ran bets but he ran young girls for him down at spring training, ages 12 to 14. Isn't that lovely. So that's statutory rape every time you do that", that is, Dowd's repetition of the statements he attributes to Bertolini and his own statements, *in toto*, to the effect that Rose committed criminal offenses consisting of serious sexual misconduct (namely, statutory rape with young teens) are defamatory in that they tend to harm Rose's reputation as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

77. At the time Dowd defamed Rose, Rose had existing product endorsement deals.

78. Rose's endorsement deals were abandoned because of Dowd's accusations of criminal offenses by Rose consisting of statutory rape and serious sexual misconduct with young teens.

  a. *Ducere Pharma abandoned its endorsement agreement with Rose*

79. Rose signed an endorsement agreement in December, 2014 with Ducere Pharma, LLC, headquartered in New Hope, Pennsylvania , about 40 miles north of Philadelphia. The agreement was signed on Rose's behalf and for his personal services by his agent CEI Sports, Inc., with his full authority and consent to grant the rights to such personal services, for which Rose would be paid by CEI Sports.

80. Rose was to promote Mayoflex pain relieving cream for Ducere Pharma. Photographs of Rose for that promotion had already been taken for use on in-store point of sale promotional

14

materials, and Rose received an initial fee of $65,000. They were in the midst of the campaign.

81. Ducere Pharma and Rose were also in continuing communications for the exercise of an option to continue to use Rose for that promotion and to expand it to other products.

82. After and because Dowd defamed Rose with accusations of statutory rape, Ducere Pharma abandoned the promotion. Ducere Pharma did not exercise its option to continue and expand the campaign featuring Rose.

83. Rose would have earned not less than $71,000 under the existing agreement, had Ducere Pharma exercised its option.

### b. *Skechers abandoned its endorsement agreement with Rose*

84. Rose entered into an agreement in or about April, 2014 with Skechers to do an advertising campaign featuring him, to be launched with a humorously toned television commercial, extending across all media with Rose appearing in print, outdoor, online and point-of-sale materials through 2015. The agreement was signed on Rose's behalf and for his personal services by his agent CEI Sports, Inc., with his full authority and consent to grant the rights to such personal services, for which Rose would be paid by CEI Sports.

85. Rose's contract with Skechers was for a term of October 1, 2014 through December 31, 2015, and contained an option by Skechers to extend the term for the same compensation.

86. The commercial featuring Rose began airing in the months before the Super Bowl and received favorable comments and reviews.

87. The commercial was so well received that Skechers re-launched that commercial during the Super Bowl on February 1, 2015. In the days beforehand, Skecher's president,

Michael Greenberg, gave a statement (published in Adweek):

> Pete isn't just a baseball legend, he's an American icon—and there's no better place for an American icon than the Super Bowl. Besides, what better place is there for Pete to state his case for the Hall? Maybe the hundred million plus people watching will turn the tide.

88. The Super Bowl commercial featuring Rose was well received and widely popular.

89. Because of the success of the Rose commercial, another Skechers commercial featuring Rose was under consideration as part of the existing advertising campaign agreement.

90. Had Skechers exercised its renewal option and another commercial gone forward, Rose would have earned not less than $250,000 pursuant to his written agreement.

91. After Dowd defamed Rose with false accusations of statutory rape, Skechers did not exercise its renewal option.

92. By reason of Dowd's defamatory statements, Rose has been caused to suffer actual compensatory harm to his reputation and standing in the community and was initially and has since remained frustrated, distraught, upset, and distressed, resulting in in actual compensatory harm in the form of personal humiliation and mental anguish and suffering, together with specific monetary harm, including, but not limited to (a) the abandonment of an existing endorsement agreement with Dusere Pharma resulting in monetary damages of not less than $65,000, and (b) the abandonment of an existing endorsement agreement with Skechers resulting in monetary damages of not less than $250,000.

93. Dowd's defamatory statements were made with both actual malice and common law malice.

94. In view of the foregoing, Rose is also entitled to recover punitive damages in an amount to be determined at trial.

95. By reason of the foregoing, Rose seeks judgment in an amount to be determined by a jury at trial, but which amount exceeds the jurisdictional minimum of $75,000 exclusive of interest and costs.

## THIRD CLAIM FOR RELIEF
## AGAINST DOWD
### (Tortious Interference with Existing or Prospective Contractual Relationship)

96. Rose repeats and realleges each and every allegation contained in paragraphs 1 through 95 hereof as if fully set forth herein.

97. Rose's commercial for Skechers was well-received and, given its broadcast during halftime of the 2015 Super Bowl, widely-viewed.

98. As evidenced by various on-air interviews given by and articles quoting Dowd in 2015, Dowd was studiously aware of all of Rose's public statements and appearances.

99. Upon information and belief, there were 114.4 million viewers of the 2015 Super Bowl in the United States, making it the most watched broadcast in U.S. television history.

100. Upon information and belief, Dowd knew of Rose's endorsement with Skechers by reason of (a) the record setting viewership of the 2015 Super Bowl, (b) the favorable comments and press given to Rose's commercial when it began airing in the months prior to the Super Bowl, (c) the nationwide attention Rose's commercial garnered during and after the 2015 Super Bowl, and (d) Dowd's demonstrable knowledge of all things done and said by Rose publicly.

101. Upon information and belief, given the foregoing, Dowd's on-air statements during WCHE 1520 AM's 7-13-15 broadcast that "Michael Bertolini, you know, told us that he not only ran bets but he ran young girls for him down at spring training, ages 12 to 14. Isn't that lovely. So that's statutory rape every time you do that" was purposeful action specifically intended to harm Rose's endorsement agreement with Skechers.

102. Dowd's purposeful action, specifically intended to harm Rose's endorsement agreement with Skechers, was not legally privileged or justified in any respect.

103. There existed a reasonable likelihood that Skechers would have renewed its endorsement contract with Rose pursuant to its option but for Dowd's tortious interference with same.

104. By reason of Dowd's tortious interference, Rose was caused to suffer damages, *to wit*, the compensation to which he would have been entitled had Skechers renewed its endorsement contract with Rose.

105. By reason of the foregoing, Rose seeks judgment in an amount to be determined by a jury at trial, but which amount exceeds the jurisdictional minimum of $75,000 exclusive of interest and costs.

WHEREFORE Plaintiff Peter Rose demands a money judgment against Defendant John Dowd for the amounts described herein and an award of punitive damages, together with costs and expenses, including attorneys' fees, of this action, and such other and further relief as the Court deems just and proper.

Dated: West Chester, Pennsylvania
July 6, 2016

LAW OFFICES OF
AUGUST J. OBER, IV AND ASSOCIATES, LLC

By: ___*/s/ AUGUST J. OBER IV*___
August J. Ober, IV

PA ID No. 94701
27 South Darlington Street
West Chester, PA 19382
Tel: (215) 779-3433
aj@oberlegal.com

18

            Martin Garbus (*pro hac vice* pending)
            Counsel to EATON & VAN WINKLE LLP
            3 Park Avenue
            New York, New York 10016
            Tel: (212) 779-9910
            mgarbus@evw.com

            *Counsel for Plaintiff Peter Rose*