**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

PETER ROSE,                                    :
                                               :
                    Plaintiff,                 :
                                               :
         v.                                    :    C.A. No. 2:16-cv-03681-PBT
                                               :
JOHN DOWD,                                     :
                                               :
                    Defendant.                 :

**[PROPOSED] ORDER**

      AND NOW, this _____ day of _____, 2016, upon consideration of Defendant

John Dowd's Motion to Dismiss Complaint, is hereby ORDERED that the motion is GRANTED

and that the Complaint is dismissed with prejudice.

BY THE COURT:

_____
PETRESE B. TUCKER
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PETER ROSE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 2:16-cv-03681-PBT |
| | : | |
| JOHN DOWD, | : | |
| | : | |
| Defendant. | : | |

### DEFENDANT JOHN DOWD'S MOTION TO DISMISS COMPLAINT

Pursuant to Federal Rule of Civil Procedure 12(b)(6), and for the reasons set forth

in the accompanying Memorandum of Law, which is incorporated here as though fully set forth,

Defendant John Dowd moves to dismiss Plaintiff's Complaint with prejudice.

Respectfully,

Dated: August 9, 2016

/s/ Eli Segal
Amy B. Ginensky (PA I.D. 26233)
Eli Segal (PA I.D. 205845)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

David C. Tobin, P.C. (admitted *pro hac*)
TOBIN, O'CONNOR & EWING
5335 Wisconsin Ave., NW
Suite 700
Washington, D.C.  20015
(202) 362-5900

*Attorneys for John Dowd*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

PETER ROSE,                                    :
                                               :
                    Plaintiff,                 :
                                               :
          v.                                   :    C.A. No. 2:16-cv-03681-PBT
                                               :
JOHN DOWD,                                     :
                                               :
                    Defendant.                 :

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANT JOHN DOWD'S MOTION TO DISMISS COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.   RELEVANT FACTUAL BACKGROUND ........................................................2

III.  ARGUMENT ......................................................................................................6

      A.    Rose's Defamation Claims Should Be Dismissed Because His Failure to
           Serve a Written Retraction Demand Limits Any Recovery for Defamation
           to "Special Damages" and He Does Not Plausibly Allege that Dowd's
           Broadcasted Comments Caused Him "Special Damages." ...................................6

           1.    Rose May Not Recover Anything Other Than "Special Damages"
                 for His Defamation Claims Because He Does Not Allege That He
                 Served a Written Demand for a Retraction of Dowd's Broadcasted
                 Comments. ...............................................................................................6

           2.    Rose Does Not Plausibly Allege That Dowd's Broadcasted
                 Comments Caused Him "Special Damages." ............................................9

      B.    Rose's Tortious Interference Claim Should Be Dismissed Because He
           Does Not Plausibly Allege (1) That Dowd Knew of Skechers' Option to
           Renew an Endorsement Deal with Rose, (2) That Dowd Made His Radio
           Comments in Order to Prevent Skechers from Renewing the Deal, or (3)
           That Dowd's Radio Comments Were What Caused Skechers Not to
           Renew the Deal ...................................................................................................12

IV.   CONCLUSION .................................................................................................14

## I.      INTRODUCTION

Nevada resident and former baseball All-Star Pete Rose, renowned for both his accomplishments and his misdeeds, has sued John Dowd for defamation and tortious interference with contract.  Rose bases his suit on comments that Dowd, the attorney who spearheaded the gambling investigation that led to Rose's lifetime ban from baseball in 1989, made during a July 2015 sports radio broadcast.  Rose's 105-paragraph Complaint fails to state a claim for defamation or tortious interference.

Starting with defamation, Rose does not allege that he made the written retraction demand that Nevada law, which governs here, requires of those who sue for defamation based on radio or television broadcasts.  This means that Rose may not recover anything other than "special" (i.e., economic) damages and that he therefore must plausibly allege "special damages" in order to state a claim.  Although Rose claims to have suffered "special damages" because two companies—Ducere Pharma and Skechers—chose not to renew endorsement deals with him, he fails to allege in any non-conclusory manner that it was Dowd's radio comments that caused the companies to do so.  Indeed, Rose does not even specify when the companies made their non-renewal decisions, much less provide any information regarding how they explained those decisions.

Turning to Rose's tortious interference claim, which he bases entirely on Skechers' non-renewal decision, dismissal is warranted for three independently sufficient reasons.  Rose does not plausibly allege (1) that Dowd knew of Skechers' option to renew an endorsement deal with Rose, (2) that Dowd made his radio comments in order to prevent Skechers from renewing the deal, or (3) that Dowd's radio comments were what caused Skechers not to renew the deal.

Therefore, Dowd respectfully requests that this Court dismiss Rose's Complaint in its entirety.

## II.    RELEVANT FACTUAL BACKGROUND

From 1984 until 1989, Rose managed the Cincinnati Reds, the first few years of which he also played for the team.  Compl. ¶¶ 10-11.  In late February 1989, upon hearing reports that Rose had bet on baseball games, including Reds games, in violation of Major League Rule 21, the Office of the Commissioner of Major League Baseball ("MLB") engaged Dowd, a Washington, D.C. attorney, to investigate whether Rose had in fact done so.  *Id.* ¶¶ 13-15, 18; Ex. A (Dowd Report Introduction and Summary of Report).[1]  Rule 21(d) prohibits "[a]ny player, umpire, or club or league official or employee" from betting on baseball, imposing a one-year ban on anyone who bets on any baseball game and a permanent ban on anyone who bets on a game "in connection with which the bettor has a duty to perform."  Ex. A at 1-2.

After conducting hundreds of interviews and reviewing thousands of pages of documents, Dowd issued a final report in which he concluded that "in sum, the accumulated testimony of witnesses, together with the documentary evidence and telephone records reveal extensive betting activity by Pete Rose in connection with professional baseball and, in particular Cincinnati Reds games, during the 1985, 1986 and 1987 baseball seasons."  Ex. A at 6; *see also* Compl. ¶ 18.  Thus, Dowd determined that Rose bet on the Reds when he played for the team and when he managed the team.

---

[1]  In addition to considering Rose's Complaint and any exhibits attached to it, the Court, in adjudicating this motion to dismiss, may consider "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading."  *Sarpolis v. Tereshko*, 26 F. Supp. 3d 407,  417 n.4 (E.D. Pa. 2014).  Similarly, the Court may consider any documents, even if not attached to the Complaint, that are "integral to or explicitly relied upon in the complaint."  *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004).  The Dowd Report qualifies under both of these formulations.  *See* Compl. ¶ 18.

Based on Dowd's findings, and with Rose's consent, MLB Commissioner Bartlett Giamatti placed Rose on MLB's permanently ineligible list in August 1989.  Compl. ¶ 19.  For over a decade after his permanent ban, Rose continued to deny having bet on baseball, let alone having bet on the Reds in particular.  Compl., Ex 2 at 3; Compl., Ex. 3 at 5.  Finally, in 2004, Rose admitted that he had bet on Reds games while he managed the team.  Compl., Ex. 4 at 1.  But he still denied ever having bet on the team as a player.  Compl., Ex. 6 at 8; Compl., Ex. 7 at 1.

At the end of February 2015, Rose filed his most recent application for reinstatement with MLB—the third such application he has filed over the years.  Compl. ¶¶ 22, 23, 32.  Several weeks later, on March 21, 2015, the *Cincinnati Enquirer* reported on allegations that Rose had provided money to buy and sell cocaine while with the Reds, quoting one of Rose's former associates as saying, "What you have to understand is that Pete did not want to get into the drug business, but that the opportunity just presented itself."  Compl., Ex. 6 at 7.  Another of Rose's former associates told the *Enquirer*:  "Let's just say it was a dark time for everyone.  Pete was not a drug dealer but he needed to do whatever it took to feed his (gambling) addiction."  *Id.* at 8.  That associate, who chose not to speak with Dowd during Dowd's investigation, said he did not regret that decision because "if I had spilled my guts, Pete probably would have gone to prison for a long time . . . [a]nd baseball would have pounded a lot more nails into his coffin in terms of coming back than there are now."  *Id.*  The *Enquirer* article then went on to discuss documents showing that, at one point, Rose owed several hundred thousand dollars to a loan shark with ties to organized crime.  *Id.* at 9.

In June 2015, ESPN reported that it had obtained pages from a notebook of a man named Michael Bertolini showing that Bertolini had placed bets on Reds games on Rose's behalf

while Rose was a Reds player in 1986.  Compl., Ex. 7 at 1.  In his 1989 Report, Dowd had

identified Bertolini as one of the people who helped Rose place his bets.  Ex. A at 4.  As one

reporter put it, the documents from Bertolini's notebook "contradict[] Rose's story and confirm[]

what Dowd stated for 26 years."  Compl., Ex. 7 at 1.  According to another reporter, "[t]he ESPN

report alone seemingly jeopardized Rose's shot at having his ban lifted."  Compl., Ex. 8 at 2.

On July 13, 2015, Dowd was interviewed by telephone on a West Chester,

Pennsylvania radio show in connection with Rose's pending reinstatement application.  Compl.

¶¶ 46-47.  During the broadcast, in response to a question about whether he could "see the

window inside [Rose's] soul and forget about all this [gambling]," Dowd said "no" and went on

to comment:  "Michael Bertolini, you know, told us that he not only ran bets but he ran young

girls for him down at spring training, ages 12 to 14.  Isn't that lovely.  So that's statutory rape

every time you do that."  *Id.* ¶ 48.  Rose says that he did not learn of Dowd's comments until

three weeks later.  *Id.* ¶¶ 51-52.

On December 14, 2015, after personally interviewing Rose, MLB Commissioner

Rob Manfred issued a decision rejecting Rose's reinstatement application.  Compl. ¶¶ 57-58; Ex.

B.[2]  In his three-page decision, Commissioner Manfred highlighted Rose's lack of credibility in

the interview and his failure to accept responsibility for his gambling-related misconduct:

> In order to be satisfied that the policy underlying Rule 21 is not
> undermined by the granting of an application for reinstatement, I
> believe that, at a minimum, there must be objective evidence which
> demonstrates that the applicant has fundamentally changed his life
> and that, based on such changes, the applicant does not pose a risk
> for violating Rule 21 in the future.

---

[2] The Court may consider Commissioner Manfred's indisputably authentic decision because the decision is "relied upon in the complaint," *Lum*, 361 F.3d at 222 n.3, and its contents "are alleged in the complaint," *Sarpolis*, 26 F. Supp. 3d at 417 n.4.  *See* Compl. ¶ 58.

Here, what has been presented to me for consideration falls well short of these requirements.  It is not at all clear to me that Mr. Rose has a grasp of the scope of his violations of Rule 21.  He claims not to remember significant misconduct detailed in the Dowd Report and corroborated by Michael Bertolini's betting notebook.  While Mr. Rose claims that he only bet on Baseball in 1987, the Dowd Report concluded that he also bet on Baseball in 1985 and 1986.  Based on the review of the Bertolini Notebook (which shows that Mr. Rose bet on Baseball during the 1986 season), I am convinced that the findings set forth in the Dowd Report are credible.  Mr. Rose's public and private comments, including his initial admission in 2004, provide me with little confidence that he has a mature understanding of his wrongful conduct, that he has accepted full responsibility for it, or that he understands the damage he has caused. . . .

In short, Mr. Rose has not presented credible evidence of a reconfigured life either by an honest acceptance by him of his wrongdoing, so clearly established by the Dowd Report, or by a rigorous, self-aware and sustained program of avoidance by him of all the circumstances that led to his permanent ineligibility in 1989. Absent such credible evidence, allowing him to work in the game presents an unacceptable risk of a future violation by him of Rule 21, and thus to the integrity of our sport.  I, therefore, must reject Mr. Rose's application for reinstatement.

Ex. B.  Commissioner Manfred did not mention Dowd's radio comments in his decision.  *Id.*

On July 6, 2016, Rose filed this lawsuit against Dowd for defamation *per se* (Count 1), defamation (Count 2), and tortious interference with existing or prospective contractual relationship (Count 3).  According to Rose, Dowd's broadcasted comments not only caused Rose reputational and emotional harm, but also caused two companies to decline to renew endorsement deals with him.  Compl. ¶¶ 69, 77-78, 92, 104.  First, Rose alleges that, in December 2014, he signed an endorsement agreement with Ducere Pharma to participate in a promotional campaign for a pain relieving cream, but that Ducere Pharma "did not exercise its option to continue and expand the campaign featuring Rose" due to Dowd's broadcasted comments.  *Id.* ¶¶ 79-80, 82.  Second, Rose pleads that he entered into an endorsement contract with Skechers "for a term of October 1, 2014 through December 31, 2015" and that, because of

Dowd's broadcasted comments, Skechers "did not exercise its renewal option." *Id.* ¶¶ 84-85, 91. Rose, however, does not say whether Ducere Pharma or Skechers ever learned of Dowd's broadcasted comments or specify when either company decided not to review his endorsement deals. Nor does he provide any other facts to establish that it was Dowd's broadcasted comments—not the other negative publicity that Rose received or anything else—that caused the companies' non-renewal decisions.

As discussed below, Rose's Complaint should be dismissed in its entirety for failure to plausibly state a claim.

## III.   ARGUMENT

### A.   Rose's Defamation Claims Should Be Dismissed Because His Failure to Serve a Written Retraction Demand Limits Any Recovery for Defamation to "Special Damages" and He Does Not Plausibly Allege that Dowd's Broadcasted Comments Caused Him "Special Damages."

#### 1.   Rose May Not Recover Anything Other Than "Special Damages" for His Defamation Claims Because He Does Not Allege That He Served a Written Demand for a Retraction of Dowd's Broadcasted Comments.

The legislature of Rose's home state, Nevada, Compl. ¶ 1, has mandated that "[i]n any action for damages for the publication of a libel in a newspaper, or of a slander[3] by radio or television broadcast, the plaintiff may recover no more than special damages unless a correction is demanded by the plaintiff and not published or broadcast." Nev. Rev. Stat. § 41.336(1). The demand must be "in writing" and "must be served within 90 days after the plaintiff has knowledge of the publication or broadcast of the statements claimed to be libelous or slanderous." *Id.* § 41.336(2)-(3).

---

[3] Under Nevada law, "slander is merely defamation that is an oral statement." *Allen v. Matheny*, No. 11-962, 2012 U.S. Dist. LEXIS 11771, at *9 n.4 (D. Nev. Feb. 1, 2012)

For purposes of § 41.336's retraction demand requirement, "special damages" are defined as "only those damages which a plaintiff alleges and proves that the plaintiff has suffered in respect to the plaintiff's property, business, trade, profession or occupation." *Id.* § 41.335; *see also* § 41.331 ("As used in NRS 41.331 to 41.338, inclusive, unless the context otherwise requires, the words and terms defined in NRS 41.332 to 41.335, inclusive, have the meanings ascribed to them in those sections."). Crucially, "special damages" does not include "damages for loss of reputation, shame, mortification and hurt feelings," all of which are classified instead as "general damages." *Id.* § 41.334 (defining "general damages"). Nor does it include "exemplary" (i.e., punitive) damages. *Id.* § 41.333.

Here, Rose does not allege that he served a written retraction demand. And given that he learned of Dowd's broadcasted comments by August 6, 2015, Compl. ¶¶ 51-52, his 90-day window to serve such a demand expired over six months ago. Rose's recovery for defamation is therefore limited solely to "special damages." This limitation in turn requires Rose to plausibly allege that Dowd's broadcasted comments in fact caused him "special damages"; otherwise, Rose's defamation claims cannot survive dismissal. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.").[4]

Given that Dowd made the comments at issue on a Pennsylvania radio show, Rose might argue that Pennsylvania law—which, unlike Nevada law, has no retraction demand requirement—applies here. Such an argument would be wrong.

---

[4] Although Rose includes two separate defamation counts in his Complaint—one for "defamation *per se*" (Count 1), one for "defamation" (Count 2)—he bases both on Dowd's broadcasted comments. Section 41.336 does not distinguish between defamation *per se* and defamation. Therefore, to the extent the two causes of action differ from one another, those differences are not relevant here.

As a federal court sitting in diversity, this Court should apply "the choice of law rules of the forum state," Pennsylvania, to determine whether Nevada or Pennsylvania law governs Rose's defamation claims. *Fairsea, LLC v. Phila. Indemnity Ins. Co.*, No. 12-595, 2012 U.S. Dist. LEXIS 177914, at *6 (E.D. Pa. Dec. 14, 2012). There is an "actual conflict" between Nevada and Pennsylvania defamation law because one would limit Rose's recovery to "special damages" absent a retraction demand and one would not. *McDonald v. Whitewater Challengers, Inc.*, 116 A.3d 99, 107 (Pa. Super. Ct. 2015). Therefore, Pennsylvania's choice of law principles require the Court to classify the conflict as "true," "false," or "unprovided-for." *Id.* A "true" conflict is one in which the "the governmental interests of both jurisdictions would be impaired if their law were not applied." *Id.* In such a situation, a court should apply the law of the state with "the greater interest in the application of its law." *Id.* A "false" conflict is one in which "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law." *Id.* In that situation, a court should apply "the law of the state whose interests would be harmed if its law were not applied." *Id.* Finally, an "unprovided-for" conflict is one in which "neither jurisdiction's interests would be impaired if its laws are not applied." In tort cases involving "unprovided-for" conflicts, "generally, the law of the state where the injury occurred is applied." *Id.* at 107 n.15.

Here, the conflict between Nevada and Pennsylvania law is "false" because, while Nevada's governmental interests would be impaired by the application of Pennsylvania law, Pennsylvania's governmental interests would not be impaired by the application of Nevada law. The enactment of § 41.336 represents a policy decision by the Nevada legislature to put the onus on Nevada citizens, like Rose, to seek to set the record straight before suing for defamation. Applying Pennsylvania law and thereby absolving one of Nevada's own citizens of § 41.336's

retraction demand requirement would contradict that legislative policy decision.  In other words, permitting Rose to pursue more than just "special damages" despite failing to send a written retraction demand would undermine the statutory scheme that Nevada adopted to incentivize a certain type of pro-active, corrective conduct by Nevadans who feel they are defamed. Pennsylvania, on the other hand, has no interest in whether Nevada's retraction demand requirement applies to Rose's claims against Dowd because neither Rose nor Dowd is a Pennsylvania resident.  Therefore, Nevada law—including Nevada's retraction demand requirement—should govern Rose's defamation claims.

Even if the Court were to find that Pennsylvania's governmental interests would be impaired by the application of Nevada law and that the conflict between Nevada and Pennsylvania law were therefore "true," the Court still should apply Nevada law to Rose's defamation claims.  Again, where a conflict is "true," the law of the state with the greater interest in the application if its law applies.  *McDonald*, 116 A.3d at 107.  And in defamation cases, courts in Pennsylvania have repeatedly held that state to be the state of the plaintiff's domicile— here, Nevada.  *See, e.g.*, *Mzamane v. Winfrey*, 693 F. Supp. 442, 469-75 (E.D. Pa. 2010) (applying law of plaintiff's domicile to defamation claim); *Franklin Prescriptions, Inc. v. N.Y. Times Co.*, 267 F. Supp. 2d 425, 431-33 (E.D. Pa. 2003) (same); *Wilson v. Slatalla*, 970 F. Supp. 405, 414-15 (E.D. Pa. 1997) (same); *Fitzpatrick v. Milky Way Productions, Inc.*, 537 F. Supp. 165, 171-73 (E.D. Pa. 1982) (same).

### 2. Rose Does Not Plausibly Allege That Dowd's Broadcasted Comments Caused Him "Special Damages."

The only "special damages" that Rose claims to have suffered here are the decisions of Ducere Pharma and Skechers not to exercise their options to renew endorsement deals with him.  But Rose does not plead any facts to support his conclusory assertion that

Dowd's broadcasted comments were what caused Ducere Pharma and Skechers not to exercise those options.  For example, Rose does not allege that Ducere Pharma or Skechers ever learned of Dowd's broadcasted comments.  Nor does he specify when Ducere Pharma and Skechers made their non-renewal decisions.  (Was it days after Dowd's broadcasted comments?  Weeks?  Months?)  Similarly, Rose does not state what Ducere Pharma or Skechers told him—or anyone else, for that matter—about why they did not renew their deals with Rose.  (Did they even mention Dowd's comments?)  Moreover, Rose does not address any of the many other potential explanations for the companies' respective non-renewal decisions—not the *Cincinnati Enquirer*'s March 2015 reporting on Rose's alleged involvement in cocaine dealing, not ESPN's June 2015 revelation of the Bertolini notebook pages that contradicted Rose's continuing denial that he bet on the Reds as a player, not Commissioner Manfred's December 2015 scathing decision denying Rose's reinstatement application, and not the possibility that using a spokesman permanently banned from baseball over twenty-five years earlier for betting on his own team had failed to boost sales.  Instead, Rose just alleges that Ducere Pharma and Skechers did not exercise their renewal options "after" and "because" of Dowd's comments and leaves it at that.  *See* Compl. ¶ 78 ("Rose's endorsement deals were abandoned because of Dowd's accusations . . . ."), ¶ 82 ("After and because Dowd defamed Rose with accusations of statutory rape, Ducere Pharma abandoned the promotion."), ¶ 91 ("After Dowd defamed Rose with false accusations of statutory rape, Skechers did not exercise its renewal option.").

These are precisely the sorts of allegations that the Supreme Court deemed insufficient to "plausibly" state a claim for relief in *Iqbal*.  They are "naked assertions devoid of further factual enhancements."  *Iqbal*, 556 U.S. at 678 (internal quotation marks and brackets omitted).  They are "[t]hreadbare recitals of [an] element[] of a cause of action, supported by

mere conclusory statements." *Id.*  And while Rose's Complaint may be consistent with his insistence that Dowd's broadcasted comments caused Ducere Pharma and Skechers not to renew their endorsement deals with him, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (internal quotation marks omitted).

Therefore, because (1) Rose may not recover anything other than "special damages" given his failure to serve a written retraction demand and (2) Rose does not plausibly allege that Dowd's broadcasted comments caused him "special damages," Rose's defamation claims should be dismissed.  Indeed, *Iqbal* itself involved a failure to plausibly allege causation—specifically, that the plaintiff's race, religion, or national origin was what caused the government to designate him a "person of high interest" and put him in maximum security confinement.  *Id.* at 681-83.  Courts in this Circuit have since followed *Iqbal*'s lead, dismissing a range of claims for failure to plausibly allege causation.  *See, e.g.*, *McLaughlin v. Bayer Corp.*, No. 14-7315, 2016 U.S. Dist. LEXIS 37516, at *26-28 (E.D. Pa. Mar. 22, 2016) (failure to plausibly allege that defendant's inadequate training of physicians caused plaintiffs' injuries); *Cauler v. Lehigh Valley Hosp., Inc.*, No. 15-1082, 2015 U.S. Dist. LEXIS 63462, at *17-19 & n.20 (E.D. Pa. May 14, 2015) (failure to plausibly allege that plaintiff's complaint about age discrimination caused employer to terminate her); *Davis v. Supervalu, Inc.*, No. 13-414, 2013 U.S. Dist. LEXIS 56341, at *14-17 (D.N.J. Apr. 19, 2013) (failure to plausibly allege that plaintiff's filing of worker's compensation claim caused employer to terminate her); *Smith v. W. Manheip Twp.*, No. 11-778, 2011 U.S. Dist. LEXIS 123135, at *26-28 (M.D. Pa. Oct. 25, 2011) (failure to plausibly allege that plaintiff's and spouse's use of ERISA benefits caused employer to terminate plaintiff); *Warfield Phila., L.P. v. Nat'l Passenger R.R. Corp.*, No. 09-1002, 2009

U.S. Dist. LEXIS 109432, at *15-19 (E.D. Pa. Nov. 20, 2009) (failure to plausibly allege that antitrust defendants caused injury to competition in a relevant market).  *Iqbal* demands dismissal here, too.

> **B.     Rose's Tortious Interference Claim Should Be Dismissed Because He Does Not Plausibly Allege (1) That Dowd Knew of Skechers' Option to Renew an Endorsement Deal with Rose, (2) That Dowd Made His Radio Comments in Order to Prevent Skechers from Renewing the Deal, or (3) That Dowd's Radio Comments Were What Caused Skechers Not to Renew the Deal.**

In his "tortious interference with existing or prospective contractual relationship" claim, Rose asserts that, in making his comments on the West Chester, Pennsylvania sports radio show, Dowd intentionally interfered with Rose's endorsement agreement with Skechers.  Compl. ¶¶ 96-104.  (Rose's Ducere Pharma endorsement agreement is not part of this claim.)  Both Nevada and Pennsylvania law require a tortious interference plaintiff to establish, among other things, that (1) the defendant knew of the contractual relationship at issue, (2) the defendant acted with the purpose of interfering with that relationship, and (3) the defendant's conduct in fact did interfere with the relationship.  *See Sutherland v. Gross*, 772 P.2d 1287, 1290-91 (Nev. 1989) (Nevada law, existing); *Wichinsky v. Mosa*, 847 P.2d 727, 729-30 (Nev. 1993) (Nevada law, prospective); *Acclaim Systems, Inc. v. Infosys, Ltd.*, No 13-7336, 2016 U.S. Dist. LEXIS 32147, at *17-18 (E.D. Pa. Mar. 14, 2016) (Pennsylvania law, existing); *Browning v. Data Access Systems, Inc.*, No. 11-5466, 2012 U.S. Dist. LEXIS 79196, at *39-41 (E.D. Pa. June 6, 2012) (Pennsylvania law, prospective).  Rose does not plausibly allege any, let alone all, of these essential elements.

First, Rose does not plausibly allege that Dowd knew about Skechers' option to renew an endorsement deal with Rose.  Rose contends "upon information and belief" that Dowd knew of this contractual relationship because Rose appeared in a Skechers commercial during the 2015 Super Bowl, the commercial received positive nationwide press, and, according to

Rose, Dowd is aware of all of Rose's public conduct.  Compl. ¶ 100.  These allegations are simply too speculative to "nudge [Rose's] claim[]" about Dowd's knowledge "across the line from conceivable to plausible."  *Iqbal*, 556 U.S. at 680.

Second, Rose does not plausibly allege that the purpose of Dowd's radio comments was to prevent Skechers from exercising its option to renew its endorsement deal with Rose.  Recognizing his burden to establish this element, Rose pleads that Dowd's comments constituted "purposeful action specifically intended to harm Rose's endorsement agreement with Skechers."  Compl. ¶ 101.  Rose repeats the same bare-bones assertion at the beginning of the next paragraph, but nowhere provides any facts to support it.  *See id.* ¶ 102 ("Dowd's purposeful action, specifically intended to harm Rose's endorsement agreement with Skechers . . . .").  Again, such "[t]hreadbare recitals of [an] element[] of a cause of action, supported by mere conclusory statements" do not pass muster under *Iqbal*.  *Iqbal*, 556 U.S. at 678.  Moreover, the assertion itself—that to prevent Skechers from renewing an endorsement agreement with Rose that he had allegedly learned about during the Super Bowl six months earlier, Dowd, in response to a question about his opinion of Rose in the middle of a sports radio show, said that Bertolini had told him about sexual misconduct involving Rose—is facially absurd.

Third, for all of the reasons discussed at pages 10-12 above, Rose does not plausibly allege that Dowd's broadcasted comments were what caused Skechers to decide not to renew its endorsement agreement with Rose.

Therefore, Rose's tortious interference count, like his defamation counts, should be dismissed for failure to state a claim.

IV.     **CONCLUSION**

        For all of these reasons, Rose's Complaint should be dismissed in its entirety.

                                       Respectfully,

Dated: August 9, 2016               /s/ Eli Segal
                                         Amy B. Ginensky (PA I.D. 26233)
                                         Eli Segal (PA I.D. 205845)
                                         PEPPER HAMILTON LLP
                                         3000 Two Logan Square
                                         Eighteenth & Arch Streets
                                         Philadelphia, PA  19103-2799
                                         (215) 981-4000

                                         David C. Tobin, P.C. (admitted *pro hac*)
                                         TOBIN, O'CONNOR & EWING
                                         5335 Wisconsin Ave., NW
                                         Suite 700
                                       Washington, D.C.  20015
                                       (202) 362-5900

                                       *Attorneys for John Dowd*

## CERTIFICATE OF SERVICE

I, Eli Segal, hereby certify that on August 9, 2016, Defendant John Dowd's

Motion to Dismiss Complaint was served on counsel for Plaintiff via ECF and mailed via first-

class mail to the following addresses:

> August J. Ober IV
> 27 S. Darlington Street
> West Chester, PA  19382
>
> Martin Garbus
> Counsel to EATON & VAN WINKLE LLP
> 3 Park Avenue
> New York, NY  10016

> /s/ Eli Segal
> Eli Segal

# EXHIBIT A

CONFIDENTIAL

## OFFICE OF THE COMMISSIONER
### MAJOR LEAGUE BASEBALL
### 350 PARK AVENUE
### NEW YORK, NEW YORK

```
                                      )
In the Matter of:                     )
Peter Edward Rose, Manager,           )
Cincinnati Reds Baseball Club         )
                                      )
```

## REPORT TO THE COMMISSIONER

Kevin M. Hallinan
Director of Security
Major League Baseball
Office of the Commissioner
350 Park Avenue
New York, New York   10022

Joseph E. Daly
Leroy D. Federle
Tim R. Jones
Business Risks International
Cincinnati, Ohio

John F. Good
Luis M. Hernandez
Business Risks International
New York, New York

Robert Fitzpatrick
J. Michael Doyle
Richard E. Slowe
Business Risks International
Boston, Massachusetts

John M. Dowd, Esq.
Terence J. Lynam, Esq.
James C. Osborne, Esq.
Kristen M. White
Special Counsel for the
  Commissioner
Akin, Gump, Hauer & Feld, L.L.P.
1333 New Hampshire Avenue, NW
Suite 400
Washington, DC   20036

May 9, 1989

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................ 1

II.  SUMMARY OF REPORT ........................... 3

III. RESULTS OF INVESTIGATION .................... 7

     A.   The Rose-Gioiosa-Peters
          Betting -- 1985 And 1986 ............... 7

     B.   The Rose-Bertolini Betting ............. 32

     C.   The Rose-Janszen-Chevashore/Val
          Betting -- April, May 1987 ............. 46

          1. Paul Janszen and
             Danita Marcum Are
             Introduced to Pete Rose ............ 46

          2. Janszen and Marcum
             Attend 1987 Spring
             Training with Pete Rose ............ 51

     D.   The Rose-Janszen-Peters
          Betting -- May, June And July 1987 ..... 73

     E.   The Rose-Janszen Debt Dispute .......... 87

     F.   Other Subjects Covered
          In Pete Rose's Deposition .............. 101

          1. Rose's Relationship
             with Joseph Cambra ................. 101

          2. Rose's Role in the
             January 1987 "Pik-Six" at
             Turfway Racetrack .................. 105

          3. Rose's Role in Winning
             the January 1989 "Pik-Six"
             at Turfway Racetrack ............... 108

IV.  DOCUMENTARY EVIDENCE ........................ 110

     A.   Pete Rose's Betting Sheets ............. 110

     B.   Paul Janszen's Betting
          Notebook .............................. 113

     C.   Ron Peters' Betting Records ........... 113

     D.   Analysis Of Betting Records ........... 114

<u>Page</u>

E.    Other Records   .........................   115

V.    SUMMARY OF BETTING ACTIVITY IN 1987  ............   117

A.    Rose Betting Chronology For
The Period April 8 –
July 5, 1987  ......................   119

    1. Betting with Chevashore  ...........   119

    2. Direct Betting with Val  ...........   125

    3. Betting with Peters  ...............   148

VI.    GUIDING LEGAL PRINCIPLES  .....................   192

A.    Circumstantial Evidence  .................   192

B.    Witness Credibility  .....................   193

    1. Personal Interest of the
Defendant in the Outcome
of the Trial  .....................   193

    2. Testimony of Informant  ............   194

    3. Testimony of a Witness
Convicted of a Crime  ..............   195

VII.    SUMMARY OF THE EVIDENCE  ......................   196

A.    The Key Evidence  .......................   196

B.    Summary Of The Testimony
Of Ron Peters  ..........................   198

    1. Summary of Corroboration
of Peters' Testimony  ..............   200

C.    Summary Of The Testimony
Of Paul Janszen  .......................   205

    1. Summary of Corroboration
of Janszen's Testimony  ............   209

D.    Analysis Of Rose's Testimony In
Light Of The Evidence  ..................   216

VIII.    ACKNOWLEDGMENT  ................................   225

## REPORT TO THE COMMISSIONER

I.      INTRODUCTION

On February 23, 1989, this firm was retained and empowered by the Office of the Commissioner[1] to investigate Peter Edward Rose, the Manager of the Cincinnati Reds Baseball Club, pursuant to the Major League Baseball Agreement.[2]  Your decision was based on the fact that the Director of Security for Major League Baseball had received reports during the past year that Pete Rose had bet on Major League Baseball games, including games of the Cincinnati Reds, in violation of Major League Rule 21.  Rule 21(d) provides:

---

[1]    Peter Ueberroth was Commissioner until March 31, 1989. On April 1, 1989, A. Bartlett Giamatti became Commissioner.

[2]    Article I, Section 2 of the Major League Agreement empowers the Commissioner to, inter alia:

   - investigate ... any act, transaction or practice charged, alleged or suspected to be not in the best interests of ... Baseball.

   - determine, after investigation, what preventive, remedial or punitive action is appropriate in the premises, and to take such action either against Major Leagues, Major League Clubs or individuals, as the case may be.

   - formulate ... the rules of procedure to be observed by the Commissioner and all other parties in connection with the discharge of his duties.  Such rules shall always recognize the right of any party in the interest to appear before the Commissioner and be heard.

- 2 -

> Any player, umpire, or club or league
> official or employee, who shall bet any sum
> whatsoever upon any baseball game in
> connection with which the bettor has no duty
> to perform, shall be declared ineligible for
> one year.

> Any player, umpire, or club or league
> official or employee, who shall bet any sum
> whatsoever upon any baseball game in
> connection with which the bettor has a duty
> to perform shall be declared permanently
> ineligible.

Betting on baseball by a participant of the game is corrupt because it erodes and destroys the integrity of the game of baseball. Betting also exposes the game to the influence of forces who seek to control the game to their own ends. Betting on one's own team gives rise to the ultimate conflict of interest in which the individual player/bettor places his personal financial interest above the interests of the team.

Gambling is conducted in secret by its participants. Normally little is recorded and what is written down is destroyed shortly after payment of the wager. Payments are often made in cash by runners between the bookmaker and the gambler because cash is fungible and difficult to trace. The runners provide insulation and, thus, deniability to the gambler and the bookmaker. The telephone is used to conduct the wagering business by the participants. It is often difficult to determine who is wagering with whom because many

- 3 -

phones are used by the bookmakers, runners and gamblers.  The
product of gambling -- particularly sports action -- is debt --
enormous debt which leads to obligations, which leads to
corruption.

The secret gambling enterprise is typically exposed
only when a participant is apprehended and begins to cooperate
with the authorities.  The difficulty for the investigator lies
in the gathering of corroborative evidence.  The gambling
enterprise is designed to leave few tracks, and upon exposure,
to provide alibis to the participants.


II.    **SUMMARY OF REPORT**

As detailed more extensively herein, Pete Rose has
denied under oath ever betting on Major League Baseball or
associating with anyone who bet on Major League Baseball.
However, the investigation has developed evidence to the
contrary.  The testimony and the documentary evidence gathered
in the course of the investigation demonstrates that Pete Rose
bet on baseball, and in particular, on games of the Cincinnati
Reds Baseball Club, during the 1985, 1986 and 1987 seasons.3/

The evidence showed that with few exceptions, Rose did
not deal directly with bookmakers but rather placed his bets

---

3/    No evidence was discovered that Rose bet against the
Cincinnati Reds.

- 4 -

through others.  As discussed in Section III, during the 1985
and 1986 seasons, Rose placed bets on baseball with Ron Peters,
a bookmaker in Franklin, Ohio.  Although Rose placed his bets
with Peters primarily through Tommy Gioiosa, on several
occasions Rose placed bets on baseball games, including
Cincinnati Reds games, directly with Peters.  Rose's dealings
with Gioiosa, and ultimately with Peters, are corroborated by
the testimony of others and by Rose's own financial records as
well.  Rose admitted placing bets with Gioiosa on football and
basketball games, but denied placing any bets on baseball games.

The evidence also showed that Rose placed bets through
another friend, Michael Bertolini.  Bertolini, in turn, placed
bets on Rose's behalf with an unidentified bookmaker in New
York City.  One source of this information is a 1988 tape
recorded conversation between Bertolini and another of Rose's
associates, Paul Janszen.  During that conversation, Bertolini
mentioned, among other things, that Rose had incurred
substantial debts to Bertolini and the New York bookmaker and
that Rose had given Bertolini personal checks which Bertolini
had had cashed and the proceeds sent to the New York
bookmaker.  Rose's financial records reveal checks in the
amounts described by Bertolini, made out by Rose to fictitious
payees.  Rose denied placing bets with Bertolini and denied
owing anyone money.  Rose acknowledged sending eleven $8,000
checks to Bertolini made out to fictitious payees but said that

- 5 -

these checks were loans to Bertolini to be used as payments to athletes for baseball card shows.

During the 1987 baseball season, Rose utilized Paul Janszen to place his baseball bets after Rose and Gioiosa had a falling out in the spring of 1987. Janszen relayed Rose's baseball bets to an acquaintance of Rose, Steve Chevashore, who in turn placed Rose's bets with a bookmaker in Staten Island, New York, identified only as "Val." Rose's betting on professional baseball, including Reds games, was testified to by Janszen and his girlfriend, Danita Marcum, and was discussed during a taped telephone conversation between Janszen and Chevashore. Rose's betting on baseball is further corroborated by betting records from Rose's home which have been identified by an expert as being in Rose's handwriting. Rose has denied ever placing any bets with Janszen at any time.

In May 1987, "Val" refused to accept bets on behalf of Rose due to Rose's failure to pay his gambling debts. Thereafter, Rose's baseball bets were again placed with Ron Peters. However, instead of being placed by Gioiosa, Rose's bets were placed with Peters by Paul Janszen. Between May and July 1987, Rose bet with Peters $2,000 per game on baseball, including Reds games. Rose's betting on baseball was also witnessed by Jim Procter and Dave Bernstein who were acquaintances of Janszen.

Section IV analyzes the documentary evidence, including Pete Rose's betting sheets, the betting notebook maintained by Paul Janszen, and the betting records of Ron Peters.  These documents have been analyzed by an expert in gambling investigations who has verified that they reflect actual games played and actual betting lines.

Finally, Section V summarizes the 1987 betting activity, incorporating information from the betting sheets and telephone traffic between Rose, Janszen, Chevashore, "Val" and Peters between April 8, 1987 and July 5, 1987.  As stated by the gambling expert, telephone records indicating short but frequent telephone calls to and from bettors, and to bookmakers, are indicative of professional betting activity. In addition, the timing of the calls also lends further corroboration to the statements of the witnesses questioned during the investigation.

Thus, in sum, the accumulated testimony of witnesses, together with the documentary evidence and telephone records reveal extensive betting activity by Pete Rose in connection with professional baseball and, in particular, Cincinnati Reds games, during the 1985, 1986 and 1987 baseball seasons.

# EXHIBIT B

OFFICE OF THE COMMISSIONER

MAJOR LEAGUE BASEBALL

---

In The Matter Of:                    )
                                     )
Peter Edward Rose_____ )

DECISION OF COMMISSIONER ROBERT D. MANFRED, JR.

CONCERNING THE APPLICATION

OF ROSE FOR REMOVAL FROM

THE PERMANENTLY INELIGIBLE LIST

December 14, 2015

On August 23, 1989, Pete Rose signed an Agreement (herein after "the 1989 Agreement") that resulted in him being placed on the permanently ineligible list for violating Major League Rule 21 (hereinafter "Rule 21"). Under the Major League Rules, an individual on the permanently ineligible list can apply for reinstatement and the 1989 Agreement did not abrogate this right. By letter dated February 26, 2015, Mr. Rose's attorneys advised me of Mr. Rose's request for reinstatement and removal from the permanently ineligible list. Mr. Rose's attorneys stated that Mr. Rose had accepted responsibility for his mistakes and their consequences, and that Mr. Rose was sorry for betting on the game of Baseball. Mr. Rose's attorney s further asserted that, as directed by Commissioner Giamatti, Mr. Rose had "reconfigured" his life. Mr. Rose wrote again to me, through counsel, on April 1, 2015, requesting a meeting in order that he be given the opportunity to show me "the extent to which he has met and surpassed Commissioner Giamatti's charge that he reconfigure his life."

Because over 26 years have passed since the submission of the Dowd Report on May 9, 1989 and Mr. Rose's execution of the Agreement, I requested that my staff conduct a comprehensive review of all materials concerning this case that have been held in the files of the Office of the Commissioner. I requested a thorough review of the matters addressed in the Dowd Report, the litigation filed by Mr. Rose on June 19, 1989, the 1989 Agreement, and John Dowd's Final Report to the Commissioner dated September 11, 1989. I also asked that my staff obtain and review additional material not in possession of the Office of the Commissioner in 1989 in order to update the Dowd Report and to provide me with as complete a picture as possible of how Mr. Rose has conducted himself from the date of the Agreement until the present. In this regard, I should point out that my staff obtained important evidence not available at the time of the Dowd Report, including a copy of a notebook taken by federal investigators from Michael Bertolini in October, 1989 and kept from public examination since that time by court order. This notebook contains records of bets placed in 1986 by Michael Bertolini on his own behalf and on behalf of Pete Rose, including bets placed on Cincinnati Reds games by Mr. Rose during the 1986 Championship Season when he was the manager-player for the Cincinnati Reds. He appeared during that season in 72 games and had 272 plate appearances. The notebook's existence and contents were revealed by ESPN on June 23, 2015 in a story emphasizing that Mr. Rose bet on Baseball while he was an active player.

At the conclusion of the staff review, a comprehensive report was submitted to me. After I had an opportunity to carefully review that report, Mr. Rose and I met on September 24, 2015 to afford him with the opportunity personally to present to me any information that might have a bearing upon his request. Prior to that meeting Mr. Rose's representatives submitted two reports to my office. The first report was prepared by Dr. Timothy Fong, the Co-Director, UCLA Gambling Studies Program and Director, UCLA Addiction Psychiatry Fellowship. I will not review the details of that report here due to confidentiality concerns. Ultimately, I gave the report little weight because the factual background recited in it is inconsistent with what Mr. Rose told me during our meeting.

The second report contained the results of a Psychophysiological Detection of Deception Test (i.e., a polygraph test) that was administered to Mr. Rose on August 5, 2015 by a consultant retained by his representatives. Mr. Rose apparently submitted to the test of his own accord in an attempt to demonstrate the veracity of certain prior statements he made concerning his violations of Rule 21. For technical reasons that were not Mr. Rose's responsibility, this report resulted in a conclusion of "no opinion" on the matters subject to the procedure.

During our meeting, Mr. Rose told me that he bet extensively on Cincinnati Reds games in 1987. He could not, however, remember many facts established by the Dowd Report that demonstrate conclusively his involvement in betting on Baseball in 1985 and 1986, while he was an active player. He made assertions concerning his betting habits that were directly contradicted by documentary evidence (the Bertolini Notebook) secured by my office following the publication of the ESPN story on June 23, 2015.[1] And, significantly, he told me that currently he bets recreationally and legally on horses and sports, including Baseball.

With this background in mind, let me clarify the precise nature of the issue before me. Under the Major League Constitution, my only concern has to be the protection of the integrity of play on the field through appropriate enforcement of the Major League Rules. It is not a part of my authority or responsibility here to make any determination concerning Mr. Rose's eligibility as a candidate for election to the National Baseball Hall of Fame ("Hall of Fame"). In fact, in my view, the considerations that should drive a decision on whether an individual should be allowed to work in Baseball are not the same as those that should drive a decision on Hall of Fame eligibility. Indeed, in considering Mr. Rose's application for reinstatement, I, as Commissioner of Baseball, must determine the risk that Mr. Rose will commit a violation of MLB's rules (most significantly Rule 21) following his reinstatement that may impact the integrity of the game. By contrast, the issue of whether Mr. Rose should be eligible for Hall of Fame election under the bylaws of that organization presents an entirely different policy determination that is focused on a range of considerations distinct from the more narrow question before me – i.e., whether I believe that Mr. Rose's reinstatement would be consonant with the policy rationale underlying Rule 21. Thus, any debate over Mr. Rose's eligibility for the Hall of Fame is one that must take place in a different forum.

Rule 21 has been a fundamental expression of policy by the Major League Clubs for nearly a century. Its stark language actually provides a limitation on the power of the Commissioner in the sense that the penalty for a player or manager who bets on a game in which he has a duty to perform is mandatory, permanent ineligibility. This severe rule is a reflection of the fact that gambling by players and managers on games involving their Clubs has the potential to undermine the integrity of the game on the field and public confidence in the game.   While the Commissioner is afforded certain discretion in considering an application under Major League Rule 15(d) for reinstatement from the permanently ineligible list, the Commissioner must exercise that discretion with great care, bearing in mind the intended deterrent effect of the mandatory penalty for a violation of Rule 21 and the best interests of Baseball. In order to be satisfied that the policy underlying Rule 21 is not undermined by the granting of an application for reinstatement, I believe that, at a minimum, there must be objective evidence which demonstrates that the applicant has fundamentally changed his life and that, based on such changes, the applicant does not pose a risk for violating Rule 21 in the future.

Here, what has been presented to me for consideration falls well short of these requirements. It is not at all clear to me that Mr. Rose has a grasp of the scope of his violations of Rule 21. He claims not

---

[1] Mr. Rose attempted to minimize the severity of his conduct by asserting that he only bet on the Reds to win. Mr. Rose further asserted that in order to avoid the impression that he only bet on games in which he believed that the Reds would win, he placed bets on every Reds game. While it makes no difference for purposes of the prohibition of Rule 21 whether Mr. Rose bet for or against the Reds, or on some or all Reds games, I note that the Bertolini Notebook shows that, contrary to his assertions, Mr. Rose did not wager on every Reds game. Thus, Mr. Rose's wagering pattern may have created the appearance to those who were aware of his activity that he selected only those games that he believed that the Reds would win.

to remember significant misconduct detailed in the Dowd Report and corroborated by Michael Bertolini's betting notebook. While Mr. Rose claims that he only bet on Baseball in 1987, the Dowd Report concluded that he also bet on Baseball in 1985 and 1986. Based on the review of the Bertolini Notebook (which shows that Mr. Rose bet on Baseball during the 1986 season), I am convinced that the findings set forth in the Dowd Report are credible. Mr. Rose's public and private comments, including his initial admission in 2004, provide me with little confidence that he has a mature understanding of his wrongful conduct, that he has accepted full responsibility for it, or that he understands the damage he has caused. As I understand it, Mr. Rose has never seriously sought treatment for either of the two medical conditions described so prominently in his 2004 book and in Dr. Fong's report. I am also not convinced that he has avoided the type of conduct and associations that originally led to his placement on the permanently ineligible list.

Most important, whatever else a "reconfigured life" may include, in this case, it must begin with a complete rejection of the practices and habits that comprised his violations of Rule 21. During our meeting, Mr. Rose told me that he has continued to bet on horse racing and on professional sports, including Baseball.[2] Those bets may have been permitted by law in the jurisdictions in which they were placed, but this fact does not mean that the bets would be permissible if made by a player or manager subject to Rule 21.

In short, Mr. Rose has not presented credible evidence of a reconfigured life either by an honest acceptance by him of his wrongdoing, so clearly established by the Dowd Report, or by a rigorous, self-aware and sustained program of avoidance by him of all the circumstances that led to his permanent ineligibility in 1989. Absent such credible evidence, allowing him to work in the game presents an unacceptable risk of a future violation by him of Rule 21, and thus to the integrity of our sport. I, therefore, must reject Mr. Rose's application for reinstatement.

Notwithstanding this conclusion, I respect Mr. Rose's accomplishments as a player and, as a result, I will continue to allow him to participate in ceremonial activities that present no threat to the integrity of the game, provided that the activities are approved by me in advance. Finally, the sanction imposed by Rule 21 means that Mr. Rose may not associate with any Major or Minor League Club. The Major League Rules, however, do not cover relationships with third parties who do business with Major League Baseball. Any future relationship Mr. Rose may contemplate with any such party is a matter between him and the party, unless it involves any association with a Major League Club, in which case, the proposed relationship must be submitted to me for review.

_Robert D. Manfred Jr._

Robert D. Manfred, Jr.
Commissioner of Baseball

_December 14, 2015_

Date

---

[2] Even more troubling, in our interview, Rose initially denied betting on Baseball currently and only later in the interview did he "clarify" his response to admit such betting.