IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PETER ROSE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 16-3681 |
| JOHN DOWD, | : | |
| | : | |
| Defendant. | : | |

<u>MEMORANDUM</u>

**TUCKER, C.J.**                                                                                                  **July 14, 2017**

      This action arises out of Plaintiff Peter Rose's allegations that, in part, Defendant John Dowd defamed Plaintiff when Defendant made certain on-air statements during a radio broadcast. Presently before the Court are Defendant John Dowd's Motion to Dismiss Complaint (Doc. 12), Plaintiff Peter Rose's Memorandum of Law in Opposition to Defendant John Dowd's Motion to Dismiss (Doc. 16), and the Reply Brief in Support of Defendant John Dowd's Motion to Dismiss Complaint (Doc. 18). Upon careful consideration of the Parties' submissions and exhibits, and for the reasons set forth below, Defendant's Motion is GRANTED IN PART AND DENIED IN PART.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

      Because the Court writes primarily for the parties, it sets forth only those facts that are relevant to its conclusion. Plaintiff Peter Rose is a former Major League Baseball ("MLB") player and manager. (Compl. ¶ 5.) In 1984, Rose became a player-manager for the Cincinnati Reds (the "Reds"). (Compl. ¶ 10.) Rose retired as a player in 1986 but remained a manager until August 1989. (Compl. ¶ 11.)

In 1989, MLB began investigating Rose to determine whether he engaged in conduct not in the best interests of baseball. (Compl. ¶ 13.) In February 1989, the Office of the Commissioner of MLB engaged John Dowd, a practicing attorney, to act as special counsel to confidentially investigate Rose. (Compl. ¶¶ 14–15.) Dowd interviewed a number of people, including Michael Bertolini. (Compl. ¶¶ 16–17.)

In May 1989, Dowd issued the "Dowd Report," in which he concluded that Rose had bet on the Reds from 1985 to 1987 in violation of Major League Rule 21. (Compl. ¶ 18.) In August 1989, the investigation ended in a confidential agreement between Rose and the Office of the Commissioner of MLB, and Rose accepted a disciplinary sanction. (Compl. ¶ 19.) As part of this sanction, Rose was placed on the ineligible list and effectively banned from working or participating in MLB events. (Compl. ¶ 19.)

On June 23, 2015, sports radio show host Jim Rome interviewed Dowd. CBS Sports Radio and its affiliate radio stations broadcast the interview. (Compl. ¶ 41.) During the interview Dowd stated:

> It's just this terrible arrogance that affects this guy and his people and you know, shame on him; he's now been caught bare ass in front of this commissioner, and I love it. And now, he's standing out there naked . . . . He had Bertolini running young women down in Florida for his satisfaction, so you know he's just not worthy of consideration or to be a part of the game; this is not who we want in the game of baseball.

(Compl. ¶ 42.) Rose claims Dowd's comment about Bertolini "running young women" was intended to harm Rose. (Compl. ¶ 43.)

On July 13, 2015, Bill Werndl, a radio sports broadcaster with the AM radio station WCHE 1520 in West Chester, Pennsylvania, interviewed Dowd by telephone. (Compl. ¶¶ 45–47.) The interview was broadcast to WCHE 1520's listening audience. (Compl. ¶ 47.) During the

interview, Dowd was asked, "do you find [Rose] a likeable person? Not a likeable person? Do you see the window inside his soul and forget about all this [betting]?" (Compl. ¶ 48.) Dowd responded:

> No. I've been asked that question -- whether he had any moral bearings at all. And the answer is no. You know, there is a lot of other activity. He constantly violated the concept of laws. Michael Bertolini, you know, told us that he not only ran bets but he ran young girls for him down at spring training, ages 12 to 14. Isn't that lovely. So that's statutory rape every time you do that. So, he's not . . . he's just not, you know, the kind of person that I find very attractive. He's a street guy.

(Compl. ¶ 48.)

The station broadcast the interview and posted it on the station's website. (Compl. ¶ 49.) Rose argues that Dowd's statements that Bertolini "ran young girls" for Rose were false and malicious accusations of statutory rape that were designed to injure him. (Compl. ¶¶ 50–51.) Dowd's statements were republished and reported. (Compl. ¶¶ 51, 56.)

MLB executive John McHale, Jr. advised Rose's representatives that MLB had no information to support Dowd's accusation that Bertolini "ran young girls" for Rose. (Compl. ¶ 53.) In August 2015, Bertolini's attorney released a public statement that:

> [Bertolini] categorically denies the allegation. He never did any such thing, nor did Pete Rose, nor did Mike say anything to Dowd about the subject. The story is libelous to him and to Rose and should be retracted immediately.

(Compl. ¶ 55.)

The Skechers Agreement

In April 2014, Rose entered into an agreement with Skechers for Rose to do an advertising campaign, which would be launched by a television commercial. (Compl. ¶ 84.) The contract term was from October 1, 2014 to December 31, 2015, and included an extension

option. (Compl. ¶ 85.) A Skechers commercial featuring Rose began airing in the months preceding the National Football League's Super Bowl XLIX and aired during the Super Bowl on February 1, 2015. (Compl. ¶¶ 86–87.) Rose contends that the commercial was successful, and as a result, another Skechers commercial featuring Rose was under consideration. (Compl. ¶ 89.) Ultimately, Skechers did not exercise its extension option. (Compl. ¶¶ 90–91.) Rose alleges that he would have earned at least $250,000.00 had Skechers exercised its extension option and launched another commercial. (Compl. ¶ 90.)

On July 6, 2016, Rose filed a complaint against Dowd for defamation *per se* (Count 1), defamation (Count 2), and tortious interference with existing or prospective contractual relationship (Count 3). On August 9, 2016, Defendant moved to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. On December 19, 2016, the Court held Oral Argument on Defendant's Motion.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). A court must accept as true all allegations contained in a complaint, but need not consider legal conclusions. *Id.*

**III.    DISCUSSION**

Dowd moves the Court to dismiss Rose's Complaint. Dowd argues that: (1) Rose's defamation claims should be dismissed because Rose's failure to serve a written retraction demand limits his recovery for defamation to special damages, and he has insufficiently pled special damages, and (2) Rose's tortious interference claim should be dismissed because Rose failed to establish every element of the claim. (Def.'s Mem. in Supp. of Mot. to Dismiss "Def.'s Mem." 6–14.) The Court will first address choice of law issues before addressing each of Defendant's arguments in turn.

**A.    Choice of Law**

This Court has subject matter jurisdiction based on diversity of citizenship. When a federal court has jurisdiction based on diversity of citizenship, the court must apply the choice of law rules of the forum state. *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.*, 609 F.3d 223, 229 (3d Cir. 2010) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Here, Pennsylvania's choice of law rules apply.

Pennsylvania's choice of law analysis consists of two steps. First, the Court must determine whether an actual conflict exists between the laws of two or more states. *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 467 (E.D. Pa. 2010). An actual conflict exists if the "application of each state's substantive law produces a contrary result." *Id.* at 468. However, no actual conflict exists if the laws between the states are the same or "if the same result would ensue under the laws of the forum state and those of the foreign jurisdiction." *Id.*; s*ee Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007). If no conflict exists, the law of the forum state governs, and the court may end its choice of law analysis. *Hammersmith*, 480 F.3d at 230.

Second, if an actual conflict exists, the court must determine whether the conflict is "true," "false," or "unprovided-for." *See Budget Rent-A-Car Sys., Inc. v. Chappell*, 407 F.3d 166, 169–70 (3d Cir. 2005); *LeJeune v. Bliss-Salem, Inc.*, 85 F.3d 1069, 1071 (3d Cir. 1996). A "true" conflict exists when both states have interests that would be impaired if the other state's laws are applied. *Taylor v. Mooney Aircraft Corp.*, 430 F. Supp. 2d 417, 422 (E.D. Pa. 2006). If a "true" conflict exists, the court must then determine which state has the greater interest. *LeJeune*, 85 F.3d at 1071. To do so, courts in Pennsylvania apply a hybrid contacts/interest analysis. *Taylor*, 430 F. Supp. 2d at 421; *Hammersmith*, 480 F.3d at 226–27.

A "false" conflict exists when only one state's interests would be impaired if the other state's laws are applied. *LeJeune*, 85 F.3d at 1071. If a false conflict exists, the law of the state whose interest would be impaired governs. *Chappell*, 407 F.3d at 170.

An "unprovided-for" conflict exists when neither state's interests would be impaired if its laws are not applied. *Chappell*, 407 F.3d at 170. If an "unprovided-for" conflict exists, the place where the wrong occurred governs. *Chappell*, 407 F.3d at 170.

### 1. Pennsylvania's Law Governs Plaintiff's Defamation Claims

The Parties dispute whether Nevada's or Pennsylvania's law should govern Rose's defamation claims. Dowd argues that Nevada's law applies because only Nevada has an interest in applying its law and, therefore, a "false" conflict exists. Rose argues that Pennsylvania's law applies because no actual conflict exists. The Court agrees with Rose.

Applying the first step of Pennsylvania's choice of law analysis, the Court reviews the laws of Nevada and Pennsylvania to determine whether an actual conflict exists. To establish a defamation claim under Nevada's law, a plaintiff must prove: "(1) a false and defamatory statement by [a] defendant concerning the plaintiff; (2) an unprivileged publication to a third

person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82, 90 (Nev. 2002). However, if the defamatory statement imputes a criminal offense, loathsome disease, person's lack of fitness for trade, business, or profession, or serious sexual misconduct, the statement constitutes defamation *per se* and proof of damages is not required. *K-Mart Corp v. Washington*, 866 P.2d 274, 282 (Nev. 1993).

To establish a defamation claim under Pennsylvania's law, a plaintiff must prove:

> (1) [t]he defamatory character of the communication; (2) [i]ts publication by the defendant; (3) [i]ts application to the plaintiff; (4) [t]he understanding by the recipient of its defamatory meaning; (5) [t]he understanding by the recipient of it as intended to be applied to the plaintiff; (6) [s]pecial harm resulting to the plaintiff from its publication; and (7) [a]buse of a conditionally privileged occasion.

42 Pa. Stat. and Cons. Stat. Ann. § 8343(a) (West 2016); *see Castellani v. Scranton Times, L.P.*, 124 A.3d 1229, 1241 (Pa. 2015). However, if the defamatory statement imputes a criminal offense, loathsome disease, business misconduct, or serious sexual misconduct, the statement constitutes defamation *per se* and proof of "special" damages is not required. *See Franklin Prescriptions, Inc. v. New York Times Co.*, 424 F.3d 336, 343 (3d Cir. 2005); *Clemente v. Espinosa*, 749 F. Supp. 672, 677 (E.D. Pa. 1990).

The Court finds that there are no relevant differences between the laws of the two states at issue pertaining to Rose's defamation claims, and the same outcome would occur under the laws of both states. Therefore, the Court concludes that no actual conflict exists, no further inquiry is required, and the law of the forum state governs.[1]

---

[1] Dowd argues that the law of Nevada, Rose's home state, applies because an actual conflict exists between the laws of Pennsylvania and Nevada, and the conflict is "false." (Def.'s Mem. 8.) Specifically, Dowd contends that Nevada's statute "Libel in Newspaper, Slander by

## 2. Pennsylvania's Law Governs Plaintiff's Tortious Interference Claim

Again, applying Pennsylvania's choice of law analysis, the Court must determine whether an actual conflict exists before determining whether the conflict is "true," "false," or "unprovided-for." To establish a tortious interference claim under Nevada's law, a plaintiff must

---

Radio or Television Broadcast," Nev. Rev. Stat. § 41.336, ("Retraction Demand Statute") applies to Rose's defamation claims. Dowd asserts that it would be a "false" conflict because only Nevada's interests would be impaired if Pennsylvania's law is applied. (Def.'s Mem. 8.)

Nevada's Retraction Demand Statute states:

> 1. In any action for damages for the publication of a libel in a newspaper, or of a slander by radio or television broadcast, the plaintiff may recover no more than special damages unless a correction is demanded by the plaintiff and not published or broadcast.
>
> 2. A demand for correction shall be in writing and shall be served upon the newspaper or broadcaster at its place of business. Such demand shall specify the statements claimed to be libelous or slanderous and shall demand a correction.
>
> 3. Such demand for correction must be served within 90 days after the plaintiff has knowledge of the publication or broadcast of the statements claimed to be libelous or slanderous.

Nev. Rev. Stat. § 41.336. The statute requires a plaintiff to demand a correction in writing before seeking "damages for the publication of a libel in newspaper, or of a slander by radio or television broadcast." Nev. Rev. Stat. § 41.336. If a plaintiff does not comply with the statute, his recovery is limited to special damages. *Id.* Pennsylvania does not employ a retraction demand statute. Therefore, if, as Defendant contends, Nevada's Retraction Demand Statute applies and limits Plaintiff to special damages, which Pennsylvania's law does not, an actual conflict would exist and further analysis would be necessary. However, if Nevada's Retraction Demand Statute does not apply, no actual conflict would exist because there are no relevant differences in Nevada's and Pennsylvania's defamation laws.

The statute's plain language requires a plaintiff to make a written demand and serve it "upon the newspaper or *broadcaster* at its place of business," and Plaintiff is limited to special damages unless he fails to do so or the correction is not published or broadcast. Nev. Rev. Stat. § 41.336(1)–(2)(emphasis added). The Court finds that Nevada's Retraction Demand Statute is inapplicable here because Dowd is not broadcaster. Though the statute applies to slander by radio broadcast, it does not apply to a non-media member like Dowd, as evidenced by the plain language of the statute.

8

prove: (1) a prospective (or existing) contractual relationship between the plaintiff and a third party; (2) the defendant's knowledge of this relationship; (3) the intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct. *See J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003); *Leavitt v. Leisure Sports Inc.*, 734 P.2d 1221, 1225 (Nev. 1987).

To establish a tortious interference claim under Pennsylvania's law, a plaintiff must prove:

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party;
>
> (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring;
>
> (3) the absence of privilege or justification on the part of the defendant; [and]
>
> (4) legal damage to the plaintiff as a result of the defendant's conduct . . . .

*Trivedi v. Slawecki*, 642 F. App'x 163, 167 (3d Cir. 2016) (citing *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009)).

The Court finds that there are no relevant differences between Nevada's and Pennsylvania's laws pertaining to Rose's tortious interference claim. Therefore, no conflict exists, no further inquiry is required, and the law of the forum state governs Rose's tortious inference claim.

B.  **Plaintiff Sufficiently Pleads a Claim for Defamation *Per Se* (Count One) and Insufficiently Pleads a Claim for Defamation (Count Two)**

In Counts One and Two, Rose alleges that Dowd's statements during the WCHE 1520 broadcast constitute defamation *per se* and defamation, respectfully. Rose contends that Dowd's statements constitute defamation *per se* because the statements suggest that Rose engaged in criminal offenses and serious sexual misconduct. (Compl. ¶ 63; Pl.'s Mem. in Opp. 11.) Rose alleges that Dowd's comments constitute defamation because the statements "tend to harm Rose's reputation as to lower him in the estimation of the community or to deter other persons from associating or dealing with him." (Compl. ¶ 76.) Dowd argues that Counts One and Two should be dismissed because Rose does not plausibly allege "special damages."[2] (Def.'s Mem. 9.)

This Court finds that Rose sufficiently pleads a claim for defamation *per se* under Pennsylvania law based on Rose's allegation that Dowd made on-air statements that "Michael Bertolini, you know, told us that he not only ran bets but he ran young girls for him down at spring training, ages 12 to 14 . . . So that's statutory rape every time you do that," and the statements impute criminal offenses and serious sexual misconduct to Rose. (Compl. ¶¶ 48, 63.) Rose alleges, in part, that Dowd published his statements on the radio, reasonable listeners would have understood the defamatory meaning of the statements, and reasonable listeners would have understood that the statements were applicable to Rose. (Compl. ¶¶ 64–67, 76.) Rose further alleges that Dowd's statements were false, Dowd knew the statements were false, Dowd made the statements with actual and common law malice, and the statements caused Rose to suffer harm to his reputation and personal humiliation. (Compl. ¶¶ 60, 69, 71–72, 92–93.) Accordingly,

---

[2] In moving to dismiss Counts One and Two, Dowd heavily relies on Rose's purported failure to comply with Nevada's Retraction Demand Statute. However, as the Court has already ruled that Pennsylvania's defamation law governs, it need not address Dowd's arguments any further.

10

accepting all of Rose's factual allegations as true, and finding that he has pled sufficient factual content that allows the Court to draw reasonable inferences that Dowd is liable for defamation *per se*, the Court concludes that there is a facially plausible claim for relief under Count One.

However, the Court finds that Rose fails to sufficiently plead a claim for defamation under Pennsylvania law. Specifically, the Court finds that the Complaint is devoid of facts to support an allegation of "special harm." Thus, the Court grants Rose's request for leave to amend his Complaint to supplement his allegations of special harm for Count Two.

    C.  **Plaintiff Fails to Plead a Claim for Tortious Interference (Count Three)**

In Count Three, Rose alleges that Dowd's statements during the WCHE 1520 broadcast were purposeful and intended to harm Rose's endorsement agreement with Skechers and, therefore, constitutes tortious interference with an existing or prospective contractual relationship. (Compl. ¶¶ 97–104.) Dowd argues that Rose's tortious interference claim should be dismissed because Rose fails to allege any of the elements necessary to establish a claim. (Def.'s Mem. 12.)

In stating a claim for tortious interference, Rose alleges that he had a contractual relationship with Skechers, and Dowd was aware of this contractual relationship because Dowd viewed or knew about the promotional commercial that aired during the Super Bowl. (Compl. ¶ 100.) Rose further alleges that Dowd's statements during the WCHE 1520 broadcast were "purposeful action specifically intended to harm Rose's endorsement agreement with Skechers." (Compl. ¶ 101.) The Court cannot give credence to such a threadbare recital of an element. Additionally, Rose fails to allege sufficient facts to demonstrate a causal connection between his damages, purportedly the compensation to which he would have been entitled had Skechers

renewed its endorsement contract with Rose, and Dowd's conduct. Thus, the Court concludes that Rose fails to state a claim for relief that is plausible on its face under Count Three.

## IV. CONCLUSION

For the reasons set forth herein, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion. An appropriate order follows.