**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PETER ROSE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 2:16-cv-03681-PBT |
| | : | |
| JOHN DOWD, | : | |
| | : | |
| Defendant. | : | |

**[PROPOSED] ORDER**

AND NOW, this _____ day of _____, 2017, upon consideration of Defendant

John Dowd's Motion to Compel, it is hereby ORDERED that the Motion is GRANTED and that,

within 10 days of the entry of this Order, Plaintiff shall:

(a)    provide full and complete responses to the two interrogatories that

Defendant's counsel proposed to Plaintiff's counsel as a compromise on June 2, 2017, attached

to Defendant's Motion as Exhibit 13;

(b)    admit or deny Requests Nos. 1-3 in Defendant's Fifth Set of Requests for

Admissions, dated May 30, 2017 and attached to Defendant's Motion as Exhibit 14;

(c)    admit or deny Requests Nos. 1-8 in Defendant's Fourth Set of Requests

for Admissions, dated May 12, 2017 and attached to Defendant's Motion as Exhibit 15;

(d)    provide full and complete responses to Interrogatories Nos. 1 and 2 in

Defendant's Second Set of Interrogatories, dated April 10, 2017 and attached to Defendant's

Motion as Exhibit 16;

(e)    admit or deny Requests Nos. 5-17 in Dowd's Fifth Set of Requests for

Admissions, dated May 30, 2017 and attached to Defendant's Motion as Exhibit 14;

(f)     produce any records regarding any mental health treatment that Plaintiff

has undergone; and

(g)     execute releases authorizing any mental health providers that have treated

or evaluated Plaintiff to produce to Defendant any records regarding Plaintiff.

BY THE COURT:


_____
PETRESE B. TUCKER
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

PETER ROSE,                                                    :
                                                              :
                          Plaintiff,                          :
                                                              :
          v.                                                  :    C.A. No. 2:16-cv-03681-PBT
                                                              :
JOHN DOWD,                                                    :
                                                              :
                          Defendant.                          :

## DEFENDANT JOHN DOWD'S MOTION TO COMPEL

Pursuant to Federal Rules of Civil Procedure 33, 34, 36, and 37, and for the reasons set forth in the accompanying Memorandum of Law, which is incorporated here as though fully set forth, Defendant John Dowd moves to compel Plaintiff Peter Rose to:

(a)     provide full and complete responses to the two interrogatories that Defendant's counsel proposed to Plaintiff's counsel as a compromise on June 2, 2017, attached as Exhibit 13;

(b)     admit or deny Requests Nos. 1-3 in Defendant's Fifth Set of Requests for Admissions, dated May 30, 2017 and attached as Exhibit 14;

(c)     admit or deny Requests Nos. 1-8 in Defendant's Fourth Set of Requests for Admissions, dated May 12, 2017 and attached as Exhibit 15;

(d)     provide full and complete responses to Interrogatories Nos. 1 and 2 in Defendant's Second Set of Interrogatories, dated April 10, 2017 and attached as Exhibit 16;

(e)     admit or deny Requests Nos. 5-17 in Dowd's Fifth Set of Requests for Admissions, dated May 30, 2017 and attached as Exhibit 14;

(f)     produce any records regarding any mental health treatment that Plaintiff has undergone; and

(g)     execute releases authorizing any mental health providers that have treated

or evaluated Plaintiff to produce to Defendant any records regarding Plaintiff.

                                        Respectfully,

Dated:  July 31, 2017                   /s/ Eli Segal
                                        Amy B. Ginensky (PA I.D. 26233)
                                        Eli Segal (PA I.D. 205845)
                                        PEPPER HAMILTON LLP
                                        3000 Two Logan Square
                                        Eighteenth & Arch Streets
                                        Philadelphia, PA  19103-2799
                                        (215) 981-4000

                                        David C. Tobin, P.C. (admitted *pro hac*)
                                        TOBIN, O'CONNOR & EWING
                                        5335 Wisconsin Ave., NW
                                        Suite 700
                                        Washington, D.C.  20015
                                        (202) 362-5900

                                        *Attorneys for John Dowd*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PETER ROSE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 2:16-cv-03681-PBT |
| | : | |
| JOHN DOWD, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANT JOHN DOWD'S MOTION TO COMPEL</u>**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................ 1

II.     RELEVANT FACTUAL BACKGROUND...................................................... 2

      A.      Rose Sues Dowd, Claiming That Dowd Falsely Accused Him of Statutory
            Rape. ................................................................................................ 2

      B.      Jane Doe Attests That Rose Had Sex with Her When She Was Under 16,
            and Rose Responds That He Did Not Do So Until Doe Was 16. ........... 5

      C.      Rose Refuses to Provide Discovery About Having Sex with Teenagers............... 7

      D.      Rose Refuses to Provide Discovery About His Well-Documented History
            of Lying........................................................................................... 9

      E.      Rose Refuses to Provide Discovery About His Mental Health History. .............. 11

III.    ARGUMENT ............................................................................................... 11

      A.      The Requests About Having Sex with Teenagers Are Relevant, and There
            Is No Justification for Refusing to Answer Them. ................................ 11

      B.      The Requests About Rose's Well-Documented History of Lying Are
            Relevant, and There Is No Justification for Refusing to Answer Them. .............. 14

      C.      The Requests About Rose's Mental Health History Are Relevant, and
            There Is No Justification for Refusing to Answer Them..................................... 16

IV.     CONCLUSION............................................................................................. 18

## I.     INTRODUCTION

Pete Rose claims that, during a sports radio interview, John Dowd falsely accused him of committing statutory rape—or, in other words, having sex with people too young to consent.  Dowd based what he said on what one of Rose's own associates told him and had no doubt that it was true, particularly given the many media reports over the years about Rose's sexual indiscretions.  But according to Rose's Complaint, "Rose never did any such thing." Compl. ¶¶ 60-61.

After Rose filed suit, a woman, referred to here as Jane Doe, provided a Declaration contradicting Rose's assertion that he never committed statutory rape.  Ex. 1 (Doe Decl.).[1]  Doe stated that Rose had sex with her when she was less than 16 years old.  Dowd then served discovery requests seeking Rose's position regarding the sexual relationship that Doe recounted.  In response, Rose admitted that he had sex with Doe, but claimed that he did not do so until 1975, when Doe was 16 years old.  Ex. 2 (Rose's Responses to Dowd's First Interrogatories) No. 1.  Rose insists that this distinction is significant because, while a 16-year-old cannot consent to have sex with a 33-year-old in many states, only those under 16 cannot do so in Ohio.

Dowd also served discovery requests seeking information about any other teenagers with whom Rose had sex.  Rose has refused to answer many of these requests.  In addition, in light of how important Rose's credibility is in this case—for example, who is to be believed about Doe's age, Doe or Rose?—Dowd served discovery requests regarding past instances in which Rose lied to serve his own interests.  Rose has refused to answer these

---

[1] While Doe's real name has been provided to Rose, Dowd has redacted it from the attachments to this filing to protect her privacy.  Dowd will submit unredacted versions if the Court would like him to do so.

requests, too.  Finally, Dowd served discovery requests regarding Rose's mental health history,

because Rose is seeking damages for mental anguish and suffering.  Rose will not provide this

information, either.

   If Rose did not want to answer questions about having sex with teenagers, his

well-documented history of lying, or his mental health, he should not have filed this lawsuit.  But

having chosen to do so, Rose should be ordered to provide the requested information.  He cannot

have it both ways.

## II.  RELEVANT FACTUAL BACKGROUND

###   A.  Rose Sues Dowd, Claiming That Dowd Falsely Accused Him of Statutory Rape.

   Pete Rose played baseball for the Cincinnati Reds from 1963-1978 and for the

Philadelphia Phillies from 1979-1983.  Compl. ¶¶ 6-7.  Rose returned to the Reds in 1984.  *Id.* ¶

10.  He was both a player and the team's manager from 1984-1986 and just its manager from

1987-1989.  *Id.* ¶¶ 10-11.

   In late February 1989, the Office of the Commissioner of Major League Baseball

("MLB") engaged Dowd, a Washington, D.C. attorney, to investigate reports that Rose had bet

on baseball games, including Reds games, in violation of Major League Rule 21.  Ex. 3 (Dowd

Report Introduction and Summary of Report) at 1.  Rule 21(d) prohibits "[a]ny player, umpire, or

club or league official or employee" from betting on baseball, imposing a one-year ban on

anyone who bets on any baseball game and a permanent ban on anyone who bets on a game "in

connection with which the bettor has a duty to perform."  *Id.* at 1-2.  In the report that he issued

with the results of the investigation, Dowd concluded that "Pete Rose bet on baseball, and in

particular, on games of the Cincinnati Reds Baseball Club, during the 1985, 1986 and 1987

seasons."  *Id.* at 3.  Thus, Dowd determined that Rose bet on the Reds when he played for the

team and when he managed the team.  Dowd also documented how, rather than dealing directly with bookies, Rose usually had one of his associates—including a memorabilia dealer named Michael Bertolini—place bets with bookies on his behalf.  *Id.* at 3-5.  In August 1989, MLB Commissioner Bartlett Giamatti placed Rose on MLB's permanently ineligible list for violating Rule 21.  Compl. ¶ 19.  Less than one year later, Rose pleaded guilty to filing false 1985 and 1987 tax returns and was sentenced to prison.  *See* Ex. 4 (July 20, 1990 *N.Y. Times* Article).  In 2004, Rose finally admitted to betting on baseball as the Reds' manager, but he continued to deny that he bet on the team as a player.  *See* Ex. 5 (June 22, 2015 ESPN Article).

At the end of February 2015, Rose filed his most recent application for reinstatement with MLB—the third such application he has filed over the years.  *Id.* ¶¶ 22, 23, 32.  On June 22, 2015, ESPN reported that a notebook seized from Bertolini during an unrelated mail fraud investigation contained records of bets that he had placed for Rose in 1986—when Rose was both a manager *and a player* for the Reds.  Ex. 5 (June 22, 2015 ESPN Article).  On July 13, 2015, Dowd was interviewed on a West Chester, Pennsylvania sports radio show about Rose's then-pending reinstatement application.  Compl. ¶¶ 46-47.  During the interview, when asked whether he could "see the window inside [Rose's] soul and forget about all this [gambling]," Dowd answered "no" and went on to comment:  "Michael Bertolini, you know, told us that he not only ran bets but he ran young girls for him down at spring training, ages 12 to 14.  Isn't that lovely.  So that's statutory rape every time you do that."  *Id.* ¶ 48.

As Dowd made clear on the radio, he based what he said about Rose and young girls on what Bertolini told him.  Dowd had no doubt that what Bertolini had told him was true, particularly given the many media reports over the years about Rose's sexual indiscretions.  The following are quotations from several such reports:

- [Rose's] attitude toward the opposite sex was vintage Cro-Magnon.  There were no qualms about displaying his appetites with breathtaking vulgarity.  For a time, after he was out of high school and in the minor leagues, his steady girlfriend was a fourteen-year-old with a sensational body, a fact that occasioned considerable gossip and not a small amount of envy at Western Hills High School.  James Reston, *Collision at Home Plate: The Lives of Pete Rose and Bart Giamatti* 115 (1991) (excerpt attached as Exhibit 6).

- Rose literally had a girlfriend in every city with a National League franchise.  He liked what he called "hard-bellies," young women with firm bodies and no flab.  He and [teammate] Tommy Helms had a little routine about this.  "Hey, Petey, how do you get all those hard-bellies?"  Tommy Helms would say.  "Just look at their fingers," Rose would reply, by which he meant the expensive rings he bought them.  Michael Sokolove, *Hustle: The Myth, Life and Lies of Pete Rose* 183 (1990) (excerpt attached as Exhibit 7).

- [Rose] flaunted his affairs openly, took his girlfriends on the team plane, stepped out in public with them in Cincinnati, gave [his then-wife] Karolyn's game tickets to them, and even took his own children out to lunch with them.  Reston, *Collision at Home Plate* 120 (excerpt attached as Exhibit 6).

- Virtually from the moment that [Rose's associate] Gioiosa arrived in Cincinnati, he remembers, Rose made no attempt to hide from him the fact that he had girlfriends.  He called it "juggling," and Gioiosa became a facilitator, picking up girlfriends from the airport, sending money to at least one of them via Western Union, taking the vaunted Hickok belt that Rose had won as the nation's best athlete to Litwin jewelers and having all the diamonds removed and made into earrings that Rose would parcel out as gifts.  Buzz Bissinger, "A Darker Shade of Rose," *Vanity Fair*, Sept. 2001, at 12-13 (article attached as Exhibit 8).

- He never had enough women and you were constantly coming across women who had affairs with him.  They all were all given the same sort of Pete Rose signature collection of Porsches, Presidential Rolexes, and boob jobs . . . . I came across a woman who had this child who didn't know that Pete was his father.  She loved him.  She was still in love with him and the sad part about it is that she was involved with him when she was a high school girl wearing a catholic schoolgirl's uniform.  ESPN Sports Century "Pete Rose" Episode (Interview of Jill Stein, *USA Today*), https://www.youtube.com/watch?v=x3qAPqLbFA4, beginning at 23:37.

Rose nonetheless sued Dowd, asserting that he had "never" committed statutory rape and that, at the time of the sports radio interview, Dowd knew that Rose had not done so.  Compl. ¶¶ 60-61, 63, 66, 71.

**B.     Jane Doe Attests That Rose Had Sex with Her When She Was Under 16, and Rose Responds That He Did Not Do So Until Doe Was 16.**

After Rose sued Dowd, Jane Doe attested in a Declaration that Rose had had sex with her before she turned 16.  Ex. 1 (Doe Decl.).  Under penalty of perjury, Doe stated the following:

> In 1973, when I was 14 or 15 years old, I received a phone call from Pete Rose of the Cincinnati Reds.
>
> Sometime after that, Pete Rose and I began meeting at a house in Cincinnati.  It was at that house where, before my sixteenth birthday, Pete Rose began a sexual relationship with me.
>
> This sexual relationship lasted for several years.
>
> Pete Rose also met me in locations outside of Ohio where we had sex.

*Id.* ¶¶ 2-5.

Dowd then served Rose with requests for admissions, asking Rose to admit (1) that he knew Doe, (2) that he had a sexual relationship with Doe, and (3) that the facts stated in Doe's Declaration were true and correct.  Ex. 9 (Dowd's First RFAs) Nos. 1-3.  Rose admitted that he knew Doe and that he had a sexual relationship with her, but denied the other facts stated in her Declaration, including that she was under 16 when their sexual relationship began and that they had sex in locations outside of Ohio.  Ex. 10 (Rose's Responses to Dowd's First RFAs) Nos. 1-3.[2]

Following up on Rose's admission of a sexual relationship with Doe, Dowd served him with the following interrogatory:

> In your March 29, 2017 responses to Defendant's First Set of Requests for Admissions, you admitted that you had a sexual relationship with [Jane Doe].  Describe your sexual relationship

_____

[2] In his responses, Rose clarified that, when he knew her and had a sexual relationship with her, Doe's last name was different than it is today.

> with [Doe].  A full answer to this interrogatory should include
> when your sexual relationship with [Doe] began, how it began,
> where it began, how long it lasted, who knew about it, where you
> first met her, who introduced you to her, how old she was when
> you first met her, how old she was when you first had sex with her,
> how old she was when you first engaged in other sexual conduct
> with her, how often you had sex or engaged in other sexual
> conduct with her, where you had sex or engaged in other sexual
> conduct with her, the type of sex that you had with her, and the
> type of other sexual conduct in which you engaged with her.

Ex. 11 (Dowd's First Interrogatories) No. 1.

Rose responded that his sexual relationship with Doe "began sometime in 1975" when, "[b]ased upon [Rose's] information and belief at that time, [Doe] was sixteen years of age." Ex. 2 (Rose's Responses to Dowd's First Interrogatories) No. 1.  Rose stated that he could not remember how his sexual relationship with Doe began, where it began, how long it lasted, who knew about it, where he first met Doe, who introduced him to her, or how old she was when he first met her.  *Id.*  According to Rose's verified response, all that he could recall was that he did not have sex with Doe until 1975; that, when they first had sex, he thought she was 16; and that they had sex "only in the greater Cincinnati, Ohio region."  *Id.*

To put Rose's admitted conduct in context, in 1975—the year he says he first had sex with Doe—Doe finished her junior year of high school.  Rose, in contrast, turned 34, was a National League All-Star for the ninth time, won the World Series MVP award, was named *Sports Illustrated*'s Sportsman of the Year, and celebrated his eleventh anniversary with his then-wife Karolyn and the sixth and eleventh birthdays of their two children.  *See* David Jordan, Pete *Rose: A Biography* 82 (2004) (excerpt attached as Exhibit 12).  Moreover, while Ohio has not

made it a crime for a 33- or 34-year-old to have sex with a 16-year-old, 12 other states have done so.[3]

### C.     Rose Refuses to Provide Discovery About Having Sex with Teenagers.

Given that the heart of Rose's case is his claim that Dowd defamed him by falsely accusing him of statutory rape, Dowd served Rose with additional discovery requests about having sex with teenagers.

First, to uncover any other girls who were or may have been under 18 when Rose engaged in sexual conduct with them, Dowd asked Rose to answer the following two interrogatories:

> Identify every person who you knew to have been under 18 years of age when the two of you first had sex or engaged in other sexual conduct.

> Identify every person who you did not know to have been over 17 years of age when the two of you first had sex or engaged in other sexual conduct.

Ex. 13 (June 2, 2017 Tobin Email).[4]  Dowd used under 18 as the age cut-off because, while the applicable age of consent is 16 in Ohio, it is 17 or 18 in twelve other states.  *See* footnote 3.  And Rose spent substantial time in six of those twelve states each year, living in Florida for one month for spring training and playing games against the Los Angeles Dodgers, the San Diego

---

[3] *See* Ariz. Rev. Stat. § 13-1405 (Arizona, illegal if under 18); Cal. Penal Code § 261.5 (California, illegal if under 18); Fla. Stat. § 794.05 (Florida, illegal if under 18); Idaho Code § 18-6101 (Idaho, illegal if under 18); 720 Ill. Comp. Stat. 5/11-1.60 (Illinois, illegal if under 17); Mo. Rev. Stat. § 566.034 (Missouri, illegal if under 17); N.Y. Penal Law §§ 130.05(3)(a), 130.25 (New York, illegal if under 17); Or. Rev. Stat. §§ 163.315(1)(a), 163.415 (Oregon, illegal if under 18); Tenn. Code § 39-13-506 (Tennessee, illegal if under 18); Tex. Penal Code § 22.011 (Texas, illegal if under 17); Utah Code § 76-5-401.2 (Utah, illegal if under 18);Va. Code § 18.2-371 (Virginia, illegal if under 18).

[4] Dowd initially served a broader interrogatory on this issue as Interrogatory No. 2 of his first set of interrogatories, but, during the meet and confer process, pared it down and broke it into the two interrogatories quoted in the text above.

Padres, and the San Francisco Giants in California; the Chicago Cubs in Illinois; the St. Louis Cardinals in Missouri; the New York Mets in New York; and the Houston Astros in Texas.

Second, Dowd asked Rose to admit that he spent time with, had sex with, and engaged in other sexual conduct with Doe at one specific address in Cincinnati.  Ex. 14 (Dowd's Fifth RFAs) Nos. 1-3.[5]  It is Dowd's understanding that this specific address is the address of the house where a friend of Rose's lived in the 1970s and that this is the "house in Cincinnati" referenced in Doe's Declaration as the place "where, before [Doe's] sixteenth birthday, Pete Rose began a sexual relationship with [her]."  *See* Ex. 1 (Doe Decl.) ¶ 3.  Rose's answers would therefore help clarify the extent to which his and Doe's respective accounts of their sexual relationship differ.

Third, Dowd asked Rose to admit that Doe was not the only 16-year-old or high school student with whom he engaged in sexual conduct when he was over 20 years old or over 30 years old.  Ex. 15 (Dowd's Fourth RFAs) 1-8.[6]

Fourth, Dowd asked Rose to identify and describe his sexual relationship with the 14-year-old Western Hills High School student who, according to the media report excerpted at page 4 above, was Rose's steady girlfriend when he was in the minor leagues.  Ex. 16 (Dowd's Second Interrogatories) No. 1.  Dowd also asked Rose to identify and describe his sexual relationship with any other Western Hills High School student who was his girlfriend or with whom he had sex or engaged in other sexual conduct when she was 15 or younger and Rose was 18 or older.  *Id.* at No. 2.

---

[5] While the actual address has been provided to Rose, Dowd has redacted it from the attachments to this filing to protect the privacy of any current and former residents.  Dowd will submit unredacted versions if the Court would like him to do so.

[6] Dowd's Fourth Set of Requests for Admissions is mistakenly titled Dowd's "Second Set of Requests for Admissions."  In his responses, Rose corrected this typographical error.

Rose has refused to answer any of these requests.  *See* Ex. 17 (June 13, 2017 Johnson Email and Attachment); Ex. 18 (Rose's Responses to Dowd's Fifth RFAs) Nos. 1-3; Ex. 19 (Rose's Responses to Dowd's Fourth RFAs) Nos. 1-8; Ex 20 (May 10, 2017 Johnson Email).[7]

> **D.    Rose Refuses to Provide Discovery About His Well-Documented History of Lying.**

Rose's credibility is critical in this case.  Doe has stated, under penalty of perjury, that Rose had sex with her before she turned 16.  Ex. 1 (Doe Decl.) ¶ 3.  Rose, on the other hand, maintains that he "never" committed statutory rape and that he did not have sex with Doe until she turned 16.  Compl. ¶¶ 60-61; Ex. 2 (Rose's Responses to Dowd's First Interrogatories) No. 1.  Therefore, Dowd served discovery requests aimed at establishing that it has long been Rose's modus operandi to lie when it serves his interests.  Specifically, Dowd asked Rose to admit that:

- He lied on his 1985 federal tax return.

- He lied on his 1987 federal tax return.

- He lied to MLB Commissioner Peter Ueberroth when he told Ueberroth, on or about February 21, 1989, that he had not bet on baseball.

- He lied under oath during his deposition in Dowd's gambling investigation when he testified, on or about April 20, 1989, "Nobody bets major league baseball for me.  Ever."

- He lied on or about August 24, 1989, in the press conference he held after being placed on baseball's permanently ineligible list, when he stated, "regardless of what the Commissioner said today, I did not bet on baseball."

- He lied to Roger Kahn, co-author of the 1989 book *Pete Rose: My Story*, when he told Kahn that he had not bet on baseball.

- He lied in his 1991 interview with Jane Pauley after being released from prison when he stated, "No way did I bet on baseball."

---

[7] All relevant discovery requests and responses thereto are set forth verbatim in the exhibits to this motion.  *See* Local R. Civ. P. 26.1(b).

- He lied in his interview with Ira Berkow for Berkow's article about him in *The New York Times*, published on or about February 28, 1993, when he told Berkow that he had not bet on baseball.

- He lied on the Dan Patrick radio show on or about March 14, 2007 when he stated, "I bet on my team to win every night."[8]

- He lied in his interview with Rachel Nichols for the CNN show "Unguarded," which aired on or about August 1, 2014, when he stated, "I never gambled as a player."

- He lied on the Michael Kay Show in or about April 2015 when, in response to the question, "What's the truth, I mean, did you ever gamble as a player?," he stated, "Never bet as a player. That's a fact."

- He lied to MLB Commissioner Rob Manfred when he told Manfred in 2015 that, in the time period when he bet on the Reds, he bet on them to win every game.[9]

- He lied to MLB Commissioner Manfred when he told Manfred in 2015 that he never bet on baseball as a player.[10]

---

[8] In his decision rejecting Rose's reinstatement application, MLB Commissioner Rob Manfred explained why this was untrue:

> Mr. Rose attempted to minimize the severity of his conduct by asserting that he only bet on the Reds to win. Mr. Rose further asserted that in order to avoid the impression that he only bet on games in which he believed that the Reds would win, he placed bets on every Reds game. While it makes no difference for purposes of the prohibition of Rule 21 whether Mr. Rose bet for or against the Reds, or on some or all Reds games, I note that the Bertolini Notebook shows that, contrary to his assertions, Mr. Rose did not wager on every Reds game. Thus, Mr. Rose's wagering pattern may have created the appearance to those who were aware of his activity that he selected only those games that he believed that the Reds would win.

Ex. 21 (Manfred Decision) at 2 n.1.

[9] As discussed at footnote 8 above, Commissioner Manfred documented this in his decision rejecting Rose's reinstatement application.

[10] Commissioner Manfred documented this, too:

> [Mr. Rose] claims not to remember significant misconduct detailed in the Dowd Report and corroborated by Michael Bertolini's betting notebook. While Mr. Rose claims that he only bet on

Ex. 14 (Dowd's Fifth RFAs) Nos. 5-17.  Rose has refused to admit or deny any of these lies.  Ex.

18 (Rose's Responses to Dowd's Fifth RFAs) Nos. 5-17.

### E.      Rose Refuses to Provide Discovery About His Mental Health History.

Rose is seeking damages for "mental anguish and suffering," claiming that after

Dowd's sports radio interview, he "was initially and has since remained frustrated, distraught,

upset, and distressed."  Compl. ¶¶ 69, 92.  Therefore, to be able to test Rose's assertion, Dowd

asked him to "produce all documents and ESI relating to any mental health treatment" that he has

received.  Ex. 22 (Dowd's First RFPs) No. 6.  In addition, during the meet and confer process,

Dowd asked Rose to execute releases to enable Dowd to subpoena records directly from mental

health providers that have treated or evaluated Rose.  Rose has refused to produce the requested

documents or to execute the requested releases.  Ex. 23 (Rose's Corrected Response to Dowd's

First RFPs) No. 6.

## III.    ARGUMENT

### A.      The Requests About Having Sex with Teenagers Are Relevant, and There Is No Justification for Refusing to Answer Them.

Even though defamation is a state law tort, Rose, as a public figure, must satisfy

two First-Amendment-mandated elements to prevail.  First, Rose must prove that Dowd made

his radio statement with "actual malice"—or, in other words, that Dowd "kn[ew] that it was

false," "in fact entertained serious doubts as to [its] truth," or had a "high degree of awareness of

---

Baseball in 1987 [i.e., when he was no longer a player], the Dowd
Report concluded that he also bet on Baseball in 1985 and 1986
[i.e., when he was both a manager and a player].  Based on the
review of the Bertolini Notebook (which shows that Mr. Rose bet
on Baseball during the 1986 season), I am convinced that the
findings set forth in the Dowd Report are credible.

Ex. 21 (Manfred Decision) at 2-3.

-11-

[its] probable falsity." *Masson v. New Yorker*, 501 U.S. 496, 510 (1991).  Second, Rose must

prove that Dowd's statement was "materially false."  *See Air Wisc. Airlines Corp. v. Hoeper*, 134

S. Ct. 852, 861 (2014) ("[W]e have required more than mere falsity to establish actual malice:

The falsity must be 'material.'" (quoting *Masson*, 501 U.S. at 517)).  This inquiry requires a

comparison between the "reputational harm" caused by the statement at issue and the

"reputational harm" that the truth would cause.  *Id.* at 863.  Specifically, to be "materially false,"

Dowd's statement "must be likely to cause reasonable people to think significantly less favorably

about [Rose] than they would if they knew the truth."  *Brokers' Choice of America, Inc. v. NBC*

*Universal, Inc.*, 2017 U.S. App. LEXIS 11490, at *37 (10th Cir. June 28, 2017) (internal

quotation marks omitted); *see also Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir.

1993) (explaining that, to be actionable, a statement must cause "significantly greater

opprobrium" than the truth).

        All of the information that Rose refuses to provide about having sex with

teenagers is relevant to Dowd's defense on this material falsity element.  Rose claims that

Dowd's radio statement is actionable because it is an "accusation[] that Rose committed

statutory rape" and, according to Rose, "Rose never did any such thing."  Compl. ¶¶ 60-61, 63.

To counter Rose's position, Dowd intends to argue that Rose cannot prove that what Dowd said

is materially false because Dowd's statement is not "likely to cause reasonable people to think

significantly less favorably about [Rose] than they would if they knew the truth" about Rose's

sexual conduct with teenagers.  *Brokers' Choice*, No. 15-1386, 2017 U.S. App. LEXIS 11490, at

*37.  To be able to make this argument as effectively as possible, Dowd needs Rose to provide

the requested information—including identifying anyone who was or may have been under 18

when Rose first engaged in sexual conduct with her and admitting or denying that he had sex

-12-

with Doe at the address of the "house in Cincinnati" that Doe references in her Declaration.  *See*
Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that
is relevant to any party's claim or defense and proportional to the needs of the case . . . .").

  Rose has objected to Dowd's requests based on a "state and federal constitutional
right of privacy."  *See* Ex. 17 (June 13, 2017 Johnson Email and Attachment); Ex. 18 (Rose's
Responses to Dowd's Fifth RFAs) Nos. 1-3; Ex. 19 (Rose's Responses to Dowd's Fourth RFAs)
Nos. 1-8.  This is absurd.  Rose chose to file this lawsuit and, by doing so, put at issue any sexual
relationships he may have had with teenagers.  He thus waived any supposed "right of privacy"
that otherwise may have applied.[11]

  Rose also refuses to answer the interrogatories about Western Hills High School
students—the only two interrogatories in Dowd's second set—because, according to Rose,
Dowd's first set of interrogatories "were comprised of 25 when you include all discrete
subparts."  Ex. 20 (May 10, 2017 Johnson Email); *see* Fed. R. Civ. P. 33(a)(1) ("Unless otherwise
stipulated or ordered by the court, a party may serve on any other party no more than 25 written
interrogatories, including all discrete subparts.").  Rose's argument turns on counting
Interrogatory No. 1—quoted in full at pages 5-6 above—as fifteen separate interrogatories.  Ex.
11 (Dowd's First Interrogatories) No. 1; *see also* Ex. 2 (Rose's Responses to Dowd's First
Interrogatories) No. 1.

  To evaluate arguments such as Rose's, courts within the Third Circuit have used
the "related question" test, which provides that "subparts that are logically or factually subsumed

---

  [11] Rose's "privacy" assertion is also undercut by the fact that, when it comes to his sex
life, he has been anything but private.  *See, e.g.*, media reports quoted at page 4 above; Pete Rose
with Rick Hill, *My Prison Without Bars* 258 (2004) (excerpt attached as Exhibit 24) ("Most folks
know about my reputation with the ladies—temptations that were just too plentiful and too hard
to resist."); https://www.youtube.com/watch?v=iUkLwbF52zE, beginning at 3:55 (discussing his
sex life in graphic detail on the Mar. 10, 2010 "Howard Stern Show").

within and necessarily related to the primary question should not be treated as separate

interrogatories." *Engage Healthcare Commc'ns., LLC v. Intellisphere, LLC*, No. 12-787, 2017

U.S. Dist. LEXIS 83068, at *10 (D.N.J. Feb. 10, 2017); *see also Pulchalski v. Franklin Cty.*, No.

15-1365, 2017 U.S. Dist. LEXIS 1151, at *9 (M.D. Pa. Jan. 5, 2017) ("[A] subpart is discrete

and regarded as a separate interrogatory when it is logically or factually independent of the

question posted by the basic interrogatory.").  In Interrogatory No. 1, Dowd asks Rose,

"Describe your sexual relationship with [Jane Doe]," and then lists fourteen pieces of

information about that relationship that "[a] full answer to this interrogatory should include."  Ex.

11 (Dowd's First Interrogatories) No. 1.  Those pieces of information are thus, on their face,

"logically [and] factually subsumed within and necessarily related to the primary

question." *Engage Healthcare*, 2017 U.S. Dist. LEXIS 83068, at *10.  Therefore, Interrogatory

No. 1 should count as one interrogatory, not fifteen.[12]

> **B.  The Requests About Rose's Well-Documented History of Lying Are Relevant, and There Is No Justification for Refusing to Answer Them.**

Rose refuses to admit or deny that he lied on his tax returns, that he lied when he

repeatedly said he did not bet on baseball, or that he lied when, after finally admitting to having

bet on baseball as a manager, he repeatedly said that he bet on his team to win *every* night and

---

[12] If the Court agrees with Rose's counting method, Dowd asks that it grant the parties leave to serve twenty-five additional interrogatories, in light of this case's scope and the importance of eliciting recollections that are as precise as possible regarding events that occurred decades ago.  *See* Fed. R. Civ. P. 33(a)(1) ("Leave to serve additional interrogatories may be granted to the extent consistent with Rule 26(b)(1) and (2).").  The two Western Hills High School interrogatories use the same language as Interrogatory No. 1 in explaining what information should be included in a description of a sexual relationship .  *See* Ex. 16 (Dowd's Second Interrogatories) Nos. 1-2.  If the Court determines that this language constitutes discrete subparts, Dowd will strike it from the Western Hills interrogatories.  In addition, while Rose appears to count Interrogatory No. 2 as four separate interrogatories, it only should count as two because Dowd has withdrawn it and replaced it with the two streamlined interrogatories quoted at page 7 above.

that he did not bet on baseball as a player.  Ex. 18 (Rose's Responses to Dowd's Fifth RFAs) Nos. 5-17.  His justification for his refusal:  his answers might not be admissible at trial.  *Id.*  Yet Rule 26(b)(1) makes clear that "[i]nformation within th[e] scope of discovery need not be admissible in evidence to be discoverable."  Fed. R. Civ. P. 26(b)(1).  Again, what matters is that the requested information is "relevant" to Dowd's defense and "proportional to the needs of the case."  *Id.*

Rose claims that he "never" committed statutory rape.  Compl. ¶ 61.  He also maintains that Doe's statement that he had sex with her when she was under 16—which would be a crime even in Ohio—is false.  Ex. 2 (Rose's Responses to Dowd's First Interrogatories) No. 1; Ohio Rev. Code Ann. § 2907.04.  Rose's history of lying when the truth would hurt him is "relevant" to assessing whether he is telling the truth today—about statutory rape in general and Doe in particular.  Fed. R. Civ. P. 26(b)(1).  Simply put, Dowd intends to show that because Rose has lied so extensively in the past, it would defy logic to believe him (and thereby disbelieve Doe) here.  And Rose cannot argue that Dowd's requests are "disproportional to the needs of the case," as it would take Rose only a few minutes to answer them.  Fed. R. Civ. P. 26(b)(1).  Rose should thus be required to admit or deny the significant lies about which Dowd has asked him.  Indeed, even if admissibility were the proper inquiry at this stage—which it is not—specific instances of Rose lying should be admissible at trial for, at the very least, cross-examination of Rose.  *See* Fed. R. Evid. 608(b) ("Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness.  *But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of: (1) the witness . . . .*" (emphasis added)).

**C.     The Requests About Rose's Mental Health History Are Relevant, and There Is No Justification for Refusing to Answer Them.**

In the 2004 autobiography in which he finally admitted that he had bet on baseball, Rose explained that he has three psychological conditions:  pathological gambling, attention deficit hyperactivity disorder, and oppositional defiance disorder.  Pete Rose with Rick Hill, *My Prison Without Bars*, at ix-xii (2004) (excerpt attached as Exhibit 24).  In addition, in connection with his 2015 reinstatement application, Rose submitted to MLB a report prepared by Dr. Timothy Fong, Co-Director of the  UCLA Gambling Studies Program and Director of the UCLA Addiction Psychiatry Fellowship.  *See* Ex. 21 (Manfred Decision) 1 (referencing Dr. Fong's report).  Again, Rose seeks damages for alleged ongoing "mental anguish and suffering," claiming that, due to Dowd's radio statement, he "was initially and has since remained frustrated, distraught, upset, and distressed."  Compl. ¶¶ 69, 92.  To be able to defend against this claim as effectively as possible, Dowd needs Rose's mental health records.  Those records may help establish that pre-existing and uncontrolled mental health conditions—not Dowd's radio statement—caused Rose's alleged ongoing mental anguish, suffering, and distress.  This seems particularly likely given that, according to Commissioner Manfred's decision rejecting Rose's application for reinstatement, "Rose has never seriously sought treatment for either of the two medical conditions described so prominently in his 2004 book and in Dr. Fong's report."  Ex. 21 (Manfred Decision) 3.[13]  Moreover, because it was apparently prepared shortly before or after Dowd's sports radio interview, Dr. Fong's report could help establish Rose's psychological state at a critical point in time.

---

[13] Due to "confidentiality concerns," Commissioner Manfred did not disclose the details of Dr. Fong's report.  Ex. 21 (Manfred Decision) 1.  Therefore, it is unclear which two of Rose's mental health conditions Dr. Fong discussed.

In refusing to produce the requested records or to execute releases to allow Dowd to subpoena them directly from the providers, Rose has invoked the psychiatrist-patient and doctor-patient privileges.  Ex. 23 (Rose's Corrected Response to Dowd's First RFPs) No. 6.  But as with his sexual relationships with teenagers, Rose's own complaint puts his mental health at issue.  He has thus waived any privilege that otherwise may have attached to the records that Dowd seeks.  *See McKinney v. Del. Cty. Mem'l Hosp.*, No. 08-1054, 2009 U.S. Dist. LEXIS 23625, at *9-20 (E.D. Pa. Mar. 20, 2009) (Tucker, J.) (holding that plaintiff waived privilege by seeking emotional distress damages); *see also Frazier v. Shinseki*, No. 12-1035, 2014 U.S. Dist. LEXIS 55254, at *3-6 (M.D. Pa. Apr. 22, 2014) (same); *Furey v. Wolfe*, No. 10-1820, 2012 U.S. Dist. LEXIS 34992, at *4-15 (E.D. Pa. Mar. 15, 2012) (same).  As this Court put it in ordering a plaintiff either to produce a signed authorization for the release of her past and present mental health records or to have her claim for emotional distress stricken, "allowing a plaintiff to hide behind a claim of privilege when that condition is placed directly at issue in the case would simply be contrary to the most basic sense of fairness and justice."  *McKinney*, 2009 U.S. Dist. LEXIS 23625, at *14 (internal quotation marks and alteration omitted).  Therefore, "this Court cannot allow [Rose] to assert a claim for emotional distress damages and simultaneously disallow [Dowd] to discover information into the possible causes of that stress."  *Id.* at *18.[14]

---

[14] Rose also has waived privilege as to Dr. Fong's report by submitting it to MLB, a third party, with his reinstatement application.  *See United States v. Ellis*, No. 02-687-1, 2003 U.S. Dist. LEXIS 9729, at *24-25 (E.D. Pa. May 8, 2003) (psychiatrist-patient privilege waived where defendant provided information at issue to law enforcement).  Dowd would not object, however, if Rose were to designate any of the requested mental health records as "confidential" under the Stipulated Protective Order governing discovery in this case.

## IV.    CONCLUSION

For all of these reasons, Rose should be ordered to:

(a)    provide full and complete responses to the two interrogatories that Defendant's counsel proposed to Plaintiff's counsel as a compromise on June 2, 2017, attached as Exhibit 13;

(b)    admit or deny Requests Nos. 1-3 in Defendant's Fifth Set of Requests for Admissions, dated May 30, 2017 and attached as Exhibit 14;

(c)    admit or deny Requests Nos. 1-8 in Defendant's Fourth Set of Requests for Admissions, dated May 12, 2017 and attached as Exhibit 15;

(d)    provide full and complete responses to Interrogatories Nos. 1 and 2 in Defendant's Second Set of Interrogatories, dated April 10, 2017 and attached as Exhibit 16;

(e)    admit or deny Requests Nos. 5-17 in Dowd's Fifth Set of Requests for Admissions, dated May 30, 2017 and attached as Exhibit 14;

(f)    produce any records regarding any mental health treatment that Plaintiff has undergone; and

(g)    execute releases authorizing any mental health providers that have treated or evaluated Plaintiff to produce to Defendant any records regarding Plaintiff.

Respectfully,

Dated: July 31, 2017

/s/ Eli Segal
Amy B. Ginensky (PA I.D. 26233)
Eli Segal (PA I.D. 205845)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

David C. Tobin, P.C. (admitted *pro hac*)
TOBIN, O'CONNOR & EWING

-18-

5335 Wisconsin Ave., NW
Suite 700
Washington, D.C.  20015
(202) 362-5900

*Attorneys for John Dowd*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

PETER ROSE,                                          :
                                                     :
                        Plaintiff,                   :
                                                     :
            v.                                       :   C.A. No. 2:16-cv-03681-PBT
                                                     :
JOHN DOWD,                                           :
                                                     :
                        Defendant.                   :

**CERTIFICATE OF GOOD FAITH**

Pursuant to Federal Rule of Civil Procedure 37(a)(1) and Local Rule of Civil

Procedure 26.1(f), I certify that I conferred in good faith with Plaintiff's counsel in an effort to

resolve the disputes discussed in this motion and that, after reasonable efforts, we were unable to

resolve those disputes.


Dated:  July 31, 2017                    /s/ David C. Tobin
                                         David C. Tobin, P.C. (admitted *pro hac*)
                                         TOBIN, O'CONNOR & EWING
                                         5335 Wisconsin Ave., NW
                                         Suite 700
                                         Washington, D.C.  20015
                                         (202) 362-5900
                                         *Attorney for John Dowd*

**CERTIFICATE OF SERVICE**

I, Eli Segal, hereby certify that on July 31, 2017, Defendant John Dowd's Motion

to Compel was filed electronically and served on all counsel of record via ECF:

                       /s/ Eli Segal                           
                       Eli Segal